[Civ. No. 21401. Fourth Dist., Div. Two. Apr. 22, 1981.]

COUNTY OF RIVERSIDE, Plaintiff and Respondent, v. LOMA LINDA UNIVERSITY, Defendant and Appellant.

304

306

**COUNSEL**

Robert J. Pickell and Karl J. Knudson for Defendant and Appellant.

Baltaxe, Rutkin & Juarez, George Baltaxe and George A. Juarez for Plaintiff and Respondent.

**OPINION**

**TAMURA, J.**—This is an action by the County of Riverside (county) against Loma Linda University (university) for indemnification for the monetary value of a settlement of a medical malpractice action against the county for injuries sustained by a child during birth at the Riverside County General Hospital (county hospital). The county's claim for indemnity is grounded on an affiliation of the university's medical school with the county hospital.

Following a jury trial, a verdict was returned in favor of the county on two independent theories: (1) The university and the county were joint venturers in providing the medical care and treatment giving rise to the malpractice action and (2) the two entities were joint tortfeasors with fault apportioned equally. Based upon the jury's findings, judgment was entered in favor of the county and against the university for one-half of the monetary value of the consideration paid for the settlement of the medical malpractice action. The university appeals from the judgment.[1]

The university seeks reversal on several grounds but the primary thrust of its appeal is that the finding that the two entities were joint venturers lacks evidentiary support.

Viewing the evidence most favorably to the party prevailing below, as we are required to do by long-settled rules on appeal (*Aceves* v. *Regal*

---

[1]The county filed a cross-appeal which has since been abandoned and ordered dismissed.

*Pale Brewing Co.* (1979) 24 Cal.3d 502, 507 [156 Cal.Rptr. 41, 595 P.2d 619]; *Nestle* v. *City of Santa Monica* (1972) 6 Cal.3d 920, 925 [101 Cal.Rptr. 568, 496 P.2d 480]), the pertinent facts (subject to amplification in our discussion of the specific contentions) may be summarized as follows:

### The Medical Malpractice Action

Mrs. Clow was admitted to the county hospital on October 22, 1967, and her child was delivered at 8:15 the following morning. The attending doctors were Bertus L. Brown, a second-year resident, and his supervisor, E. A. Pachten, a third-year resident. A Riverside obstetrician in private practice who was chief of staff of the obstetrics-gynecology department of the hospital was on backup call. Mrs. Clow underwent a difficult delivery marked by a protracted second-stage labor. Pelvimetry examination indicated the baby was in a breach position. About 15 minutes before delivery, a substantial drop in the fetal heart tone was noted. Dr. Brown attempted a forceps delivery, but was unsuccessful. He called for Dr. Pachten who ultimately delivered the baby using forceps. The child developed cerebral palsy and in 1972 he filed a medical malpractice action through his guardian ad litem against the county. The university was not named as a defendant.

The malpractice action was settled through an agreement between the plaintiffs and Pacific Indemnity, referred to in the agreement as the county's "primary insurer." The settlement was structured to provide for payment of a stipulated sum forthwith and for the establishment of a trust sufficient in amount to generate an agreed upon annual income for the benefit of the child through January 1, 2044. Following the settlement, the county instituted the instant action for indemnity against the university.

### The Affiliation Agreement

In 1963 the university entered into an "AFFILIATION AGREEMENT" with the county whereby the university agreed to furnish the teaching services of the faculty members of its medical school to the county hospital. It was agreed that the faculty members would, under the direction of the county hospital administrator and its chief of professional services, instruct and train interns and resident physicians at the county hospital and, concurrently with the teaching services, render medical care and services "as designated by the Hospital Administrator and

Chief of Professional Services." Such care and services were to include "both direct care of patients and the supervision of medical care rendered by resident physicians and interns of the Hospital."

The agreement authorized the university's medical school to make recommendations concerning the selection of professional employees of the hospital and membership on the voluntary professional staff but reserved the ultimate power of appointment to the county. In addition, there was a general provision declaring that the affiliation agreement was not to be deemed a relinquishment to the university of any of the county's statutory powers, express or implied, over the administration of the hospital. That provision reads:

"It is mutually agreed that by the terms of this agreement the County has not granted or delegated any of its powers—statutory, implied, administrative, medical or otherwise—to the University or School, and that the teaching program, the treatment of the Hospital patients, medical research, the use of the clinical equipment, the hiring, acceptance, and assignments of personnel will all be and remain within the jurisdiction of the County and exercised through the office of the Administrator and the Chief of Professional Services; further that this contract in no way constitutes a delegation of the County's power to determine the admissibility and elegibility of patients for care either as out-patients or in-patients in the Hospital; and further that this agreement in no way confers upon the University or the School the right to possess, to use, or to control any County property."

The agreement contained the following hold harmless provision: "It is mutually agreed that the University, School, doctors, and medical students are independent contractors and shall be responsible for the manner in which they perform the services required of them under the terms of this agreement. The University agrees to hold the County and its Hospital harmless against any and all suits and/or claims or liability for damage arising from any activity of the University or School personnel in the Hospital under the provisions of this agreement."

*The Joint Residency Program*

Soon after execution of the affiliation agreement and in furtherance of its objectives, Dr. William G. Slate, professor and chairman of the medical school's department of obstetrics-gynecology and Dr. William W. Brown, chief of obstetrics-gynecology services at the county hospi-

tal, made application to the American Medical Association for certification of a joint residency program in obstetrics-gynecology for the Loma Linda Hospital and the county hospital. Dr. Slate was designated the director of the program.

Under the joint residency program, residents served their three years of specialized training in obstetrics and gynecology at the Loma Linda Hospital and the county hospital on a six-month rotation basis. They signed two contracts of employment, one with Loma Linda and one with county; while serving at the county hospital, they were paid by the county and while serving at Loma Linda they were paid by the university. The physicians attending Mrs. Clow in October 1967 were residents in the joint program and each had signed separate contracts with the university and the county.

The residency program included structured teaching conferences in various aspects of the specialty (conducted at the county hospital and at the medical school) and clinical experience. According to Dr. Slate, he was in charge of the residents' clinical training but he gave Dr. Brown (chief of the county's obstetrics-gynecology services) "considerable latitude and responsibility" in the operation of the clinical program at the county hospital. Dr. Slate testified that he "worked with him [Dr. Brown] in establishing policies and procedures" but he had the "power of veto." The clinical training at the county hospital was conducted under progressive supervision depending upon the complexity of the procedure involved. Simple procedures were performed by an intern supervised by a resident. More complex procedures were performed by a resident with advanced training supervised by an attending physician or a medical school faculty member.

In furtherance of the goals of the affiliation agreement, medical school faculty members were granted staff privileges at the county hospital and most of the staff doctors at the county hospital were accorded faculty status with the medical school.

*The Verdict and Judgment*

The jury returned a special verdict in which it responded to numerous questions submitted to it. The jury found, inter alia: There was a joint venture between the university and the county; the residents attending Mrs. Clow were acting in the course and scope of their authority as agents of the joint venture; the negligence of the residents was a proxi-

mate cause of the injury to the child; the university and the county were joint tortfeasors with 50 percent fault attributable to each; the county was not actively negligent; the monetary value of the settlement of the medical malpractice action was $944,109; and the settlement was made in good faith.

■ The judge ruled that the jury's findings precluded the county from recovering under the indemnity clause of the affiliation agreement. He determined that the jury finding that the county was not actively negligent was irreconcilable with the finding that the residents were acting as agents of the county (as well as the university).[2] The judge decided, however, that under the jury's findings, the county was entitled to be indemnified to the extent of 50 percent of the loss either on the theory that the university and the county were joint venturers or on the theory the county and university were concurrent tortfeasors with fault apportioned 50 percent to each. Accordingly, judgment was entered in favor of the county and against the university for $472,054, with interest from the date of the settlement.

The university contends that the judgment must be reversed for the following reasons: (1) The joint venture finding lacks evidentiary support; (2) the county is precluded from recovering on the concurrent tortfeasor theory (a) because the plaintiffs in the malpractice action failed to name the university as a joint tortfeasor and (b) because the county failed to file a cross-complaint for indemnity against the university in that action; (3) the county is not entitled to seek indemnity because the loss was paid by the county's insurer; (4) the court erred in excluding evidence tending to show that the county provided medical malpractice insurance coverage for the residents; (5) the court abused its discretion in denying a motion for a new trial for insufficiency of the evidence to support the verdict; and (6) the court erred in failing to require special findings on certain questions proposed by the university.

In the ensuing analysis, we have determined that the university's attack on the joint venture finding must be sustained but that its remaining contentions lack merit. We therefore affirm the judgment on the basis of the jury's findings that the two entities were joint tortfeasors with fault apportioned equally between them.

---

[2]The active negligence of an indemnitee precludes recovery under a general indemnity clause. (*Morgan* v. *Stubblefield* (1972) 6 Cal.3d 606, 624 [100 Cal.Rptr. 1, 493 P.2d 465]; *Markley* v. *Beagle* (1967) 66 Cal.2d 951, 962 [59 Cal.Rptr. 809, 429 P.2d 129].) Since the indemnity provision of the "AFFILIATION AGREEMENT" was a general indemnity agreement, the judge properly denied recovery under it.

I

■ The university's main assault on the judgment is that the evidence does not support the finding that the two entities were joint venturers with respect to the care and treatment of Mrs. Clow. It is the university's position that the affiliation agreement and the implementing joint residency program only involved the university in the education and training of residents and interns and that, by the very terms of the affiliation agreement, responsibility for providing medical care and treatment to patients at the county hospital remained exclusively with the county. The university points to the provisions wherein the parties agreed that the county was not relinquishing or delegating to the university any of its powers or rights relating to the administration of the hospital or over the care and treatment of patients.

The county maintains that the evidence supports the joint venture finding and the university's vicarious liability for the negligence of the residents.[3] It directs our attention to the provisions of the affiliation agreement in which the university agreed that the faculty members would, concurrently with the teaching services, render medical care and services "as designated by the Hospital Administrator and Chief of Professional Services," including "both direct care of patients and the supervision of medical care rendered by resident physicians and interns of the hospital." The county also points to evidence that the residents were selected by a three-person committee composed of Dr. Slate and two other doctors who were on the medical school faculty and the county hospital staff; that the faculty members were accorded staff privileges at the county hospital and most of the staff members at the county hospital had teaching status at the medical school; that Dr. Slate of the medical school was in charge of the clinical training aspect of the residency program at the county hospital and that Dr. William Brown of the county hospital was also a paid faculty member of the medical school. The county also refers to the testimony of Dean Hinshaw of the medical school characterizing the relationship between the clinical and teaching aspects of the training program as one which was difficult to "unravel" because residency was "education taking place" in a clinical setting.

---

[3]"[T]he negligence of one joint venturer or of his employes acting in connection with the joint venture is imputed to the other joint venturers." (*Leming* v. *Oilfields Trucking Co.* (1955) 44 Cal.2d 343, 350 [282 P.2d 23, 51 A.L.R.2d 107]; *Buckley* v. *Chadwick* (1955) 45 Cal.2d 183, 190 [288 P.2d 12, 289 P.2d 242], reh. den., *id.* at p. 208; *Cahill Bros., Inc.* v. *Clementina Co.* (1962) 208 Cal.App.2d 367, 387-388 [25 Cal.Rptr. 301].)

■ The term "joint venture" usually connotes a commercial objective. It exists where there is "an agreement between the parties under which they have a community of interest, that is, a joint interest, in a common business undertaking, an understanding as to the sharing of profits and losses, and a right of joint control."[4] (*Holtz v. United Plumbing & Heating Co.* (1957) 49 Cal.2d 501, 506-507 [319 P.2d 617]; *Connor v. Great Western Sav. & Loan Assn., supra*, 69 Cal.2d 850, 863; see *Dillard v. Rowland* (Mo.App. 1974) 520 S.W.2d 81, 90-91, wherein the court found that an affiliation contract between a university medical school and a private hospital was not a joint venture.)

■ Whether the parties to a contract have created a joint venture or some other relationship involving cooperative effort, depends upon their actual intention which must be determined in accordance with ordinary rules governing interpretation of contracts. (*Universal Sales Corp. v. Cal. etc. Mfg. Co.* (1942) 20 Cal.2d 751, 765 [128 P.2d 665]; *Boyd v. Bevilacqua* (1966) 247 Cal.App.2d 272, 285 [55 Cal.Rptr. 610]; see *Holtz v. United Plumbing & Heating Co., supra*, 49 Cal.2d 501, 506.) Where the evidence bearing on the issue is conflicting, the existence of a joint venture is primarily a question of fact. (*Nelson v. Abraham* (1947) 29 Cal.2d 745, 750 [177 P.2d 931]; *Bank of California v. Connally* (1973) 36 Cal.App.3d 350, 364 [111 Cal.Rptr. 468]; *Iron etc. Co. v. American Milling etc. Co.* (1931) 115 Cal.App. 238, 246 [1 P.2d 1008].) On the other hand, where there is no conflicting extrinsic evidence concerning the interpretation of the contract creating the relationship, the issue is one of law. (See *Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839].)

■ In the case at bench, the question is whether the parties intended to enter into a joint venture agreement for the care and treatment of patients at the county hospital. Neither the terms of the affiliation agreement nor the evidence alluded to by the county show that the parties intended to enter a joint venture for patient care. The principal objective of the affiliation agreement was to make the teaching services

[4]The term "joint enterprise" is sometimes used to define a noncommercial undertaking entered into by associates with equal voice in directing the conduct of the enterprise (Prosser, Torts (4th ed. 1971) § 72, pp. 475-481), but when used to describe a business or commercial undertaking it has been used interchangeably with the term "joint venture" and courts have not drawn any significant legal distinction between the two. (*Connor v. Great Western Sav. & Loan Assn.* (1968) 69 Cal.2d 850, 863-864, fn. 6 [73 Cal.Rptr. 369, 447 P.2d 609, 39 A.L.R.3d 224].)

of the medical school faculty available to the county for the education and training of interns and residents and that objective was implemented by the establishment of the joint residency program. Dr. Slate's testimony that he was in charge of the "clinical program" at the county hospital as well as at Loma Linda and Dean Hinshaw's testimony that educational and clinical aspects of the residency program were difficult to unravel are consistent with the terms of the affiliation agreement. Their references to the clinical program obviously had to do with training residents in a clinical setting and the care and treatment of patients incident to such training. The provisions of the affiliation agreement make it unmistakably clear that it was not intended to be an agreement for the joint management and operation of the hospital.[5] There was no understanding concerning division of revenues or sharing of losses or of a right of joint control. The relationship created by the agreement was limited to a teaching affiliation; the county obtained the services of the medical school faculty to educate and train residents, interns and other hospital professionals and the university obtained a clinical environment for the medical school's educational purposes.

We find no conflicting extrinsic evidence concerning the interpretation of the affiliation agreement. It is therefore our function and duty to make an independent determination of the meaning of the contract. (*U. S. Leasing Corp.* v. *Dupont* (1968) 69 Cal.2d 275, 284 [70 Cal.Rptr. 393, 444 P.2d 65]; *Parsons* v. *Bristol Development Co., supra*, 62 Cal.2d 861, 866.) We have done so and for the reasons heretofore stated, we conclude that the parties did not intend to embark on a joint venture for patient care and treatment at the county hospital.

Thus, the judgment cannot be sustained on the theory that the university was vicariously liable for the negligence of the resident physicians. The judgment must stand or fall on the jury's finding that the two entities were joint tortfeasors.

## II

■ The university contends that the judgment cannot be upheld on the joint tortfeasor theory (1) because the university was not sued as a joint tortfeasor in the medical malpractice action and (2) because the

---

[5]In recent years, many county hospitals have been closed; management of others has been transferred to private concerns; and several have been sold to the University of California as teaching hospitals. (See *County Hospitals In Crisis: Legislative Response to Assure Indigent Health Care* (1977) 10 U.C. Davis L.Rev. 331.)

county failed to cross-complain for indemnity in that action. The contentions lack merit.

The county's claim to indemnity under the joint tortfeasor theory is not grounded on the right of contribution under Code of Civil Procedure section 875 et seq.;[6] it is based upon the principle of comparative equitable indemnity enunciated in *American Motorcycle Assn.* v. *Superior Court* (1978) 20 Cal.3d 578 [146 Cal.Rptr. 182, 578 P.2d 899]. As the Supreme Court explained in *American Motorcycle*, California's contribution statute did not preclude the court from adopting the comparative indemnity rule. (*Id.*, at p. 603.) ■ A tort defendant's claim for comparative indemnity from a concurrent tortfeasor is separate and distinct from the injured party's claim against the tortfeasors and, therefore, the right to seek indemnity against a joint tortfeasor is not foreclosed by the injured party's failure to name him as a joint tortfeasor. (*People* ex rel. *Dept. of Transportation* v. *Superior Court* (1980) 26 Cal.3d 744, 752 [163 Cal.Rptr. 585, 608 P.2d 673].)

■ Nor does the fact that the county failed to cross-complain against the university in the medical malpractice action preclude it from maintaining an independent action for indemnity. (*E. L. White, Inc.* v. *City of Huntington Beach* (1978) 21 Cal.3d 497, 505-506 [146 Cal.Rptr. 614, 579 P.2d 505]; *American Bankers Ins. Co.* v. *Avco-Lycoming Division* (1979) 97 Cal.App.3d 732, 734 [159 Cal.Rptr. 70].) A cause of action for indemnity does not accrue or come into existence until the indemnitee has suffered actual loss for which he is entitled to

[6]Code of Civil Procedure section 875 provides: "(a) Where a money judgment has been rendered jointly against two or more defendants in a tort action there shall be a right of contribution among them as hereinafter provided.

"(b) Such right of contribution shall be administered in accordance with the principles of equity.

"(c) Such right of contribution may be enforced only after one tortfeasor has, by payment, discharged the joint judgment or has paid more than his pro rata share thereof. It shall be limited to the excess so paid over the pro rata share of the person so paying and in no event shall any tortfeasor be compelled to make contribution beyond his own pro rata share of the entire judgment.

"(d) There shall be no right of contribution in favor of any tortfeasor who has intentionally injured the injured person.

"(e) A liability insurer who by payment has discharged the liability of a tortfeasor judgment debtor shall be subrogated to his right of contribution.

"(f) This title shall not impair any right of indemnity under existing law, and where one tortfeasor judgment debtor is entitled to indemnity from another there shall be no right of contribution between them.

"(g) This title shall not impair the right of a plaintiff to satisfy a judgment in full as against any tortfeasor judgment debtor."

indemnity, either through payment of a court judgment or through settlement. (*People* ex rel. *Dept. of Transportation* v. *Superior Court, supra,* 26 Cal.3d 744, 751-752; *E. L. White, Inc.* v. *City of Huntington Beach, supra,* 21 Cal.3d 497, 506; see *Klemme* v. *Hoag Memorial Hospital Presbyterian* (1980) 103 Cal.App.3d 640, 644 [163 Cal.Rptr. 109].) The rule extends to a claim for comparative equitable indemnity under *American Motorcycle.* (*People* ex rel. *Dept. of Pub. Works* v. *Superior Court, supra,* 26 Cal.3d 744, 757.) Nor is the rule altered by the fact that a defendant is permitted to bring a declaratory cross-complaint in the original action. (*Id.,* at pp. 759-760.)

For the foregoing reasons, the university's two legal arguments against liability under the joint tortfeasor theory must fail.

The university does not appear to question the sufficiency of the evidence to support the finding of liability under the joint tortfeasor theory. It did not do so in its opening brief and, although the county's brief argues that there was substantial evidence that the university breached its duty of care to the Clow baby by negligently failing to perform its obligations under the affiliation agreement, the university failed to file a reply brief. Despite the university's apparent failure to challenge the alternative theory of liability other than on the two legal grounds we have rejected, we nevertheless comment briefly on certain legal and evidentiary aspects of the joint tortfeasors theory of liability in view of the university's contention that the court abused its discretion in failing to order a new trial for insufficiency of the evidence to support the jury verdict.

■ The affiliation agreement gave rise to a duty on the part of the university to exercise due care towards patients under the care and treatment of the resident physicians. A duty of care to persons not in contractual privity may arise out of a contract. (*Biakanja* v. *Irving* (1958) 49 Cal.2d 647, 649 [320 P.2d 16, 65 A.L.R.2d 1358]; *J'Aire Corp.* v. *Gregory* (1979) 24 Cal.3d 799, 803-804 [157 Cal.Rptr. 407, 598 P.2d 60]; *Heyer* v. *Flaig* (1969) 70 Cal.2d 223, 226-227 [74 Cal.Rptr. 225, 449 P.2d 161]; *Lucas* v. *Hamm* (1961) 56 Cal.2d 583, 588 [15 Cal.Rptr. 821, 364 P.2d 685], cert. den. *Lucas* v. *Hamm,* 368 U.S. 987 [7 L.Ed.2d 525, 82 S.Ct. 603].) The determination whether a defendant will be liable to a third person for neligence in the performance of a contract in a specific situation involves a balancing of a number of policy factors, including (1) the extent to which the transaction was intended to affect the plaintiff; (2) the foreseeability of

harm to the plaintiff; (3) the degree of certainty that the plaintiff suffered injury; (4) the closeness of the connection between the defendant's conduct and the injury suffered; (5) the moral blame attached to the defendant's conduct; and (6) the policy of preventing future harm. (*Biakanja v. Irving, supra,* 49 Cal.2d 647, 650; *J'Aire Corp. v. Gregory, supra,* 24 Cal.3d 799, 804; *Connor v. Great Western Sav. & Loan Assn., supra,* 69 Cal.2d 850, 865; *Valdez v. J. D. Diffenbaugh Co.* (1975) 51 Cal.App.3d 494, 506 [124 Cal.Rptr. 467].)

Application of the *Biakanja* criteria to the instant case compels the conclusion that the university owed a duty to patients who were under the care and treatment of residents to see that the residents received proper education and training in their specialty and proper supervision over the clinical aspect of their training. (1) The affiliation agreement was intended to affect patients at the county hospital. The agreement recites that the county desires to assure and improve patient care and that a functional working relationship with a medical school is "in the interest of improved patient care as well as the development of a stimulating educational atmosphere for the benefit of interns, residents...." (2) The foreseeability of harm to the baby; (3) the certainty that he was injured; and (4) the closeness of the relationship between the university's negligent failure to provide proper instruction and training to the residents and the baby's injury are manifest. (5) The failure to properly train and instruct the residents knowing that the health and safety of those entrusted to their care are dependent upon their skill and knowledge may be properly characterized as blameworthy conduct. (6) A determination that the university has a duty of care will serve as an incentive to the university and other medical schools affiliated with hospitals for teaching purposes to discharge their teaching obligations in the interest of improved patient care (as the affiliation agreement herein so recites) as well as for the educational benefit of the interns and residents.[7]

■ We agree with plaintiff that there was substantial evidence that the university was negligent in discharging its contractual obligations to educate and train the residents and to supervise the clinical aspects of their training. There was expert testimony that second stage labor

---

[7]The special relationship created by the affiliation agreement and the availability of an objective standard for determining what conduct constitutes due care distinguish this case from the so-called educational malpractice cases. (See Elson, *A Common Law Remedy for the Educational Harm Caused by Incompetent or Careless Teaching* (1978) 73 Nw. U.L.Rev. 641, 693-695.)

should not have been permitted to exceed two hours; that while there was nothing wrong with the clerk's (medical students from Loma Linda Medical School) monitoring the mother's progress, a resident should have checked the patient every half hour which, from the records, it appears was not done; that the first attempt at forceps delivery should have occurred at 6:30 a.m., failing which the mother should have immediately been prepared for Caesarean section; that the senior resident should have been present when the first attempt was made to deliver the child by forceps. The expert testified that during the period in question, the standard of practice for responsible medical teaching institutions was to teach interns and residents that second stage labor should not be permitted to exceed two hours. According to the medical record, Mrs. Clow was permitted to undergo second-stage labor for three hours and forty-five minutes.

It may be reasonably inferred from the foregoing evidence that the residents who attended Mrs. Clow had not been properly instructed and trained in their specialty and from that inference it may be inferred that the university was negligent in performing its contractual obligations under the affiliation agreement. "'An inference is a deduction of fact that may logically and reasonably be drawn from another fact or group of facts found or otherwise established in the action.' (Evid. Code, § 600.) . . . (*Blank* v. *Coffin*, 20 Cal.2d 457, 461 [126 P.2d 868] *Garland* v. *Hirsh*, 74 Cal.App.2d 629, 636 [169 P.2d 405]; *Grover* v. *Sharp and Fellows etc. Co.*, 66 Cal.App.2d 736, 742 [153 P.2d 83].) [¶] . . . If the first inference is proper, a deduction of fact drawn from that inference is likewise proper provided *it is not too remote or speculative.* (*People* v. *Warner*, 270 Cal.App.2d 900, 908 [76 Cal.Rptr. 160]; *People* v. *Davis*, 235 Cal.App.2d 214, 225 [45 Cal.Rptr. 297]; Witkin, Cal. Evidence (2d ed.) pp. 1052-1054.)" (*Dimond* v. *Caterpillar Tractor Co.* (1976) 65 Cal.App.3d 173, 181 [134 Cal.Rptr. 895].) Whether an inference may be drawn is a question of law but whether an inference should be drawn is a question of fact for the jury. (*Hardin* v. *San Jose City Lines, Inc.* (1953) 41 Cal.2d 432, 436 [260 P.2d 63]; *Juchert* v. *California Water Service Co.* (1940) 16 Cal.2d 500, 503 [106 P.2d 886].) Where two or more inferences can be reasonably deduced from the facts, a reviewing court is without power to substitute its deductions for those of the fact finder. (E.g., *Juchert* v. *California Water Service Co., supra*, 16 Cal.2d 500, 503; *De Angeles* v. *Roos Bros., Inc.* (1966) 244 Cal.App.2d 434, 438 [52 Cal.Rptr. 783].) In finding that the university was concurrently negligent and that such negligence was a proximate cause of the injury to the baby, the jury necessarily drew the

inference that the residents had not been properly instructed and trained and from that inference deduced the fact that the university was negligent in performing its obligations under the affiliation agreement. The deductions were not unreasonable. We are, therefore, bound by the inferences drawn by the jury.

## III

■ The university next contends that the county lacked standing to seek indemnity because the settlement was made by Pacific Indemnity and the county therefore suffered no loss. The university's argument takes the following form: A right to indemnity does not exist unless the indemnitee has suffered actual loss through payment; a claimant has no right to indemnity even though payment may have been made on his behalf by his insurer unless the payment comes within the collateral source rule; the collateral source rule does not extend to payments made in satisfaction of a judgment against a joint tortfeasor by his insurance carrier; the county was therefore not a real party in interest and could not maintain the action.

The county's standing to sue was never challenged in the trial court, either on a factual or legal basis.[8] It is being raised for the first time on appeal and is based solely on the fact that the settlement agreement recites that it was entered into between the plaintiffs in the medical malpractice action and Pacific Indemnity referred to in the agreement as "the county's primary insurer." Based on that evidence alone, we cannot say as a matter of law that the county suffered no loss as a result of the settlement or that affirmance will result in double recovery for the county.

More importantly, lack of standing as a real party in interest is not jurisdictional; it is equivalent only to a failure to state a cause of action. (1 Witkin, Cal. Procedure (2d ed. 1970) Jurisdiction, § 183, p. 712; 3 Witkin, Cal. Procedure (2d ed. 1971) Pleading, §§ 760, 814, pp. 2379, 2424.) While a failure to state a cause of action may be raised at anytime, during trial or appeal, reversal of a judgment on that ground is justified and required only if the error resulted in a miscarriage of jus-

---

[8] The university asserts that the fact that the county was not a proper party was raised in the university's trial brief. The portion of the trial brief to which we have been directed, however, fails to substantiate the assertion.

tice. (Cal. Const., art. VI, § 13;[9] *In re Eugene W.* (1972) 29 Cal.App.3d 623, 631 [105 Cal.Rptr. 736]; see *Steffen* v. *Refrigeration Discount Corp.* (1949) 91 Cal.App.2d 494, 500 [205 P.2d 727]; *Ades* v. *Brush* (1944) 66 Cal.App.2d 436, 443-444 [152 P.2d 519].)

In the case at bench, assuming that the entire loss was paid by the county's insurer, the university has failed to show how it was prejudiced by the failure to bring the action in the name of the insurer instead of the county. The requirement that every action "must be prosecuted in the name of the real party in interest" (Code Civ. Proc., § 367) is designed to protect a defendant from a multiplicity of suits and from future annoyances or vexation, and to fix and determine the real liability alleged in the complaint. (*Anheuser-Busch, Inc.* v. *Starley* (1946) 28 Cal.2d 347, 352 [170 P.2d 448, 166 A.L.R. 198]; *Bank of Orient* v. *Superior Court* (1977) 67 Cal.App.3d 588, 594 [136 Cal.Rptr. 741]; *Space Properties, Inc.* v. *Tool Research Co.* (1962) 203 Cal.App.2d 819, 828 [22 Cal.Rptr. 166].) Here, there is no suggestion that the university will be subjected to a subsequent claim by the county's insurer or any other person. Indeed, since the settlement was made on December 9, 1975, the statute of limitations has long since run on a subrogee's claim for indemnity whether the statute be one year (see *De La Forest* v. *Yandle* (1959) 171 Cal.App.2d 59, 62 [340 P.2d 52]), or two years (Code Civ. Proc., § 339). Moreover, from the fact that the claims adjuster involved in the settlement of the original claim testified in this action as to the terms of the settlement, we can infer that Pacific Indemnity was well aware of the filing and progress of this action. Thus, there is no showing that affirmance of the judgment will result in double recovery by the county for the same loss. The university has failed to demonstrate that the failure to bring the action in the name of the insurer resulted in a miscarriage of justice.

IV

The university's contention that the court erred in excluding evidence that the county carried medical malpractice insurance coverage for Dr. Pachten merits little consideration.

---

[9]California Constitution, article VI, section 13 provides: "No judgment shall be set aside, or new trial granted, in any cause, on the ground of misdirection of the jury, or of the improper admission or rejection of evidence, or for any error as to any matter of pleading, or for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice."

Dr. Pachten's testimony was presented to the jury through his deposition. The university says that during the reading of the deposition a question arose concerning the admissibility of a comment made by Dr. Pachten concerning malpractice insurance coverage and that plaintiff's objection to the reading of that portion of the deposition was erroneously sustained. The university asserts that the "record clearly reflects that there were comments made by Dr. Pachten with respect to his malpractice insurance...." Unfortunately for the university, the deposition is not a part of the record on appeal and the reporter's transcript fails to show what comments pertaining to medical malpractice insurance, if any, Dr. Pachten made to which plaintiff's counsel objected.[10] Moreover, the university has failed to demonstrate that the ruling, even if erroneous, resulted in a miscarriage of justice. The jury must have been fully aware that the county had malpractice insurance. The settlement agreement was in evidence and claims representatives from the insurance company testified concerning the monetary value of the settlement. Finally, the evidence was relevant, if at all, only on the joint venture issue. Since we have determined that the judgment cannot be upheld on that theory, no miscarriage of justice can result from the court's ruling.

---

[10]The reporter's transcript reveals the following:

"'Q. You also signed separate agreements, did you not, with the County and the University?

"'A. [Dr. Pachten] That is true, but, as I stated earlier, I don't have a recollection of—and I am not going to pretend to remember everything I signed as I came on staff at either hospital—but it was really admission to the hospital staff—'

"MR. BALTAXE: I would like to object to the remainder of that question.

"MR. KNUDSEN: May we approach the bench, Your Honor?

"THE COURT: Yes.

"(Whereupon the following discussion was had at the bench out of the hearing of the jury.)

"MR. KNUDSEN: Understandably Mr. Baltaxe may be a little bit reticent about the subject of malpractice insurance, however, he indicated before that he was going to call or may want to call the custodian of records for Reserve Insurance Company. Also, the pleadings are pretty clear and the settlement agreement is pretty clear that payments were made by an insurance company for the purpose of settlement of the underlying litigation, and on that ground I don't think this is the usual collateral source problem. I think it is relevant to the situation and it is relevant to the doctor's understanding of the relationship between the institutions at the time.

"MR. BALTAXE: I think number one there has been no mention of malpractice insurance yet, and although I said what I might do, it hasn't happened yet and may not happen depending on trial strategy.

"Secondly, this is just speculation as to who insured whom and can't have any probative value on what happened in this case, so that it's irrelevant as to what he thinks who covered what. That is an issue here.

"THE COURT: I'll sustain the objection. We'll leave it out."

■ The university also contends that the court erred in failing to submit to the jury the university's request for special findings on the issue of joint venture, including whether Dr. Brown and Dr. Pachten were acting as agents of the joint venture and, if so, whether they were acting within the scope of their agency. The questions propounded in the verdict form prepared by the judge from proposed verdict forms submitted by the parties adequately covered all of the issues bearing on the joint venture theory. In any event, in view of our disposition of the joint venture theory, the claimed error cannot affect the outcome of this appeal.

## V

■ Finally, the university contends the trial court abused its discretion in denying its motion for a new trial for insufficiency of the evidence to support the verdict. The university's argument is based on the comments the judge made just before he discharged the jury. He told the jurors he disagreed with their conclusion as to the existence of a joint venture, stating: "[I]f I had to decide, my decision would result in Loma Linda being exonerated on the educational versus patient care argument." He added, however, that he thought there was enough evidentiary basis for the jury's determination. In denying the motion for a new trial, the judge commented that there was sufficient evidence to make the joint venture issue a factual question and that, "therefore, the jury's decision on that controls."

We find no abuse of discretion in the trial court's ruling. A motion for a new trial should not be granted for insufficiency of the evidence "unless ... the court is convinced from the entire record ... that the ... jury *clearly* should have rendered a different verdict...." (Code Civ. Proc., § 657; italics supplied.) Here, the judge did not say that he thought the jury "clearly" should have reached a different verdict. The fact that he said he would have ruled differently had he been deciding the case does not indicate an abuse of discretion. (*Causey v. Cornelius* (1958) 164 Cal.App.2d 269, 283-284 [330 P.2d 468].)

In *Lippold v. Hart* (1969) 274 Cal.App.2d 24 [78 Cal.Rptr. 833], on which the university relies, the trial judge expressed the view that he was powerless to grant a new trial in the circumstances. Although in the present case the judge did say that since "the matter is a question of fact and therefore the jury's decision on that controls," the statement in context does not suggest that the judge felt he was powerless to grant a

new trial. After making the quoted comment, he added that he did not think that any further trial would result in a different verdict, that he thought the jury was an intelligent one and did a fine job. This clearly reveals that the judge exercised his discretion in denying the motion for a new trial.

## DISPOSITION

For all of the foregoing reasons, the judgment is affirmed.

Gardner, P. J., and Morris, J., concurred.