108 Cal.Rptr.2d 728 (2001)
90 Cal.App.4th 162
AMERICAN EQUITY INSURANCE COMPANY, Plaintiff and Appellant,
v.
Daniel BECK, Defendant and Respondent.
Daniel Beck, Plaintiff and Appellant,
v.
Ronald H. Wecht et al., Defendants and Respondents.
Nos. A092221, A092636.
Court of Appeal, First District, Division Three.
June 26, 2001.
Review Granted September 19, 2001.
*729 Drath, Clifford, Murphy, Wennerholm & Hagen, John M. Drath, Oakland, Raymond Z. Bacerdo, for plaintiff and appellant American Equity Insurance.
Carlson, Calladine & Peterson LLP, Guy D. Calladine, San Francisco, Henry Chun, for defendant and respondent Beck.
M. Armon Cooper, San Francisco, for plaintiff and appellant Beck.
*730 Drath, Clifford, Murphy, Wennerholm & Hagen, John M. Drath, Oakland, Raymond Z. Bacerdo, for defendants and respondents Wecht and Walkup, Melodia, Kelly & Echeverria.
HORNER, J.[*]
In these consolidated appeals we consider whether counsel who associate to concurrently represent clients owe each other a fiduciary duty, or only owe a duty of loyalty to the clients. In a related matter, we consider whether such counsel can be considered to have entered into a joint venture, allowing one to seek indemnity from the other under the Uniform Partnership Act. The trial court answered each of these questions in the negative, and granted summary judgment motions for the defendants in each action. We affirm.

Factual and Procedural Background
In 1992 Michael and Robert Stephens hired Attorney Daniel Beck to represent them in a lawsuit against General Motors, to recover for serious injuries the Stephenses sustained when the pick-up truck they were riding in rolled over and burst into flames. With the Stephenses' consent, Beck associated Texas Attorney L.L. McBee into the case, because McBee had experience prosecuting what was known as "side-saddle" gas tank cases against General Motors. Again with agreement of the clients, McBee and Beck associated Attorney Ronald Wecht and his law firm, Walkup, Melodia, Kelly & Escheverria (collectively Wecht), as local trial counsel. By separate written agreements, it was agreed that McBee would advance all costs, and Beck's contingent fee would be split 53 percent for McBee and 47 percent for Beck. Wecht was to receive 10 percent of the contingent fee, to be shared pro rata from the shares of McBee and Beck.
Despite attempts at pretrial settlement, no settlement was reached, and the case proceeded to jury trial in April 1997. During the course of the trial, General Motors offered to settle the case for $6 million. On the night before closing arguments, the Stephenses met with Wecht and McBee and told them they wanted to settle the case. McBee was to contact General Motors and discuss settlement, but never did so. In late June of 1997, the jury returned a defense verdict.
In the months leading up to trial, the relationship between Beck and the other attorneys, particularly McBee, eroded. McBee accused Beck of undermining settlement negotiations, and Beck accused McBee of alienating him from his clients. By the time of trial Beck was an observer, not a participant.
After trial, the Stephenses brought a legal malpractice action against McBee and Wecht for failing to carry out their settlement instructions. In addition, they claimed that Wecht was vicariously liable for McBee's misconduct based upon joint venture principles. The Stephenses brought no action against Beck. McBee settled with the Stephenses for a confidential sum. As a condition of settlement, Beck was paid $224,000 out of this sum, in exchange for a release of his claims against McBee. Thereafter, Wecht admitted that McBee was negligent in his handling of the Stephenses' case. Although Wecht denied that a joint venture existed, his malpractice insurance carrier, American Equity Insurance Company (American Equity) paid $1.4 million to settle the Stephenses' claims against Wecht.
*731 In December 1998, Beck filed a complaint against Wecht for breach of fiduciary duty to recover the fee he would have received had McBee and Wecht followed the Stephenses' instructions and settled the case against General Motors for $6 million. In July 1999, Wecht filed a cross-complaint for indemnity, breach of fiduciary duty, comparative fault and breach of contract. Thereafter, American Equity intervened and sued Beck in subrogation, seeking contribution from Beck toward the settlement amount it paid on Wecht's behalf. Each party successfully moved for summary judgment of the other's claims. Both parties timely appealed from the orders granting summary judgment, and we have consolidated the appeals for oral argument and decision.

Standard of Review
In reviewing a trial court's order granting summary judgment, we are limited to the facts shown in the supporting and opposing affidavits and declarations, as well as those in admissions, answers to interrogatories, depositions, and matters of which judicial notice may be taken. Because of strong public policy favoring a trial on the merits, we are bound by the same principles governing the trial court's determination on summary judgment. We therefore strictly construe the moving party's papers and liberally construe the opposing party's papers. All doubts as to the propriety of granting the motion are to be resolved in favor of the party opposing the motion. (AARTS Productions, Inc. v. Crocker National Bank (1986) 179 Cal. App.3d 1061, 1064-1065, 225 Cal.Rptr. 203; Code Civ. Proc, § 437c, subd. (b).) While we review a summary judgment ruling under the same general principles applicable to the trial court, we do so de novo, independently determining whether, under the facts as presented, there exists a triable issue of material fact. (Buss v. Superior Court (1997) 16 Cal.4th 35, 60, 65 Cal. Rptr.2d 366, 939 P.2d 766; Saldana v. Globe-Weis Systems Co. (1991) 233 Cal. App.3d 1505, 1511-1515, 285 Cal.Rptr. 385.) Upon our independent review, we may affirm a summary judgment for reasons different from the trial court's reasons for granting it. (Bunnell v. Department of Corrections (1998) 64 Cal.App.4th 1360,1367, 76 Cal.Rptr.2d 58.)
In moving for summary judgment, the defendant has the initial burden of showing that, as to each cause of action alleged in the complaint, the plaintiff cannot establish one or more of the elements of the cause of action. (Code Civ. Proc, § 437c, subd. (o).) If such a showing is made, the burden shifts to the plaintiff, who must respond by presenting admissible evidence in the form of specific facts that create a triable issue of material fact as to the attacked element. (Ibid.) Summary judgment is warranted if no triable issue is established. (Id., subd. (c).)

Beck's Appeal (No. A092636)
Wecht moved for summary judgment on Beck's complaint for breach of fiduciary duty, in which Beck sought to recover the contingent fee he claimed to have lost as a result of Wecht's inappropriate handling of the Stephenses' action. The trial court granted summary judgment, finding that, as a matter of law, Wecht owed Beck no fiduciary duty. We agree.
Two cases have squarely addressed the question of the duties owed by one attorney to another attorney jointly representing the same client. The trial court initially relied on the first of these cases, Pollack v. Lytle (1981) 120 Cal.App.3d 931, 175 Cal.Rptr. 81 (Pollack), and overruled Wecht's demurrer to Beck's claim of breach of fiduciary duty on the ground that such a cause of action could be stated. *732 Subsequently, the second case, Joseph A. Saunders, P.C. v. Weissburg & Aronson (1999) 74 Cal.App.4th 869, 87 Cal.Rptr.2d 405 (Saunders) was published. Saunders held that no such duty could exist between cocounsel. Relying on Saunders, the trial court granted Wecht's motion for summary judgment. We consider each case, and conclude that Saunders rests upon sounder policy considerations than does Pollack. Accordingly, we agree with the trial court's conclusion that Beck presented no triable issue of any material fact, and properly granted summary judgment in favor of Wecht.

Pollack v. Lytle
In Pollack, Attorney Pollack sued Attorney Lytle for breach of fiduciary duty, fraud, breach of contract, legal malpractice and declaratory relief arising out of their joint representation of a client in a medical malpractice action. Pollack alleged in his complaint that he and the client had agreed that he would be paid 50 percent of any recovery obtained by the client. Relying on Lytle's false representations, Pollack associated Lytle as trial counsel, and agreed that he would receive one-third of Pollack's 50 percent contingent fee. Unbeknownst to Pollack, Lytle did not properly prepare the case for trial. Because of Lytle's continued misrepresentations, Pollack advised the client to reject a $250,000 pretrial settlement offer. The case went to trial, and due to Lytle's improper handling of the case, the jury returned a defense verdict in the medical malpractice action. Adding insult to injury, Lytle convinced the client to sue Pollack for legal malpractice. (Pollack, supra, 120 Cal. App.3d at pp. 936-939, 175 Cal.Rptr. 81.)
The Court of Appeal, over a strongly worded dissent, reversed the trial court's order sustaining Lytle's demurrer, holding that simple agency principles governed the relationship of associate counsel. (Pollack, supra, 120 Cal.App.3d at pp. 940-943, 175 Cal.Rptr. 81.) Although it acknowledged "the growing body of law which holds, as a matter of public policy, that a successor attorney owes no duty to his predecessor [citations]" (id. at p. 942, 175 Cal.Rptr. 81), the majority found the policy rationale of these cases inapplicable to cases involving associate, or concurrent counsel. It reasoned: "The roles of successor and associate attorneys are decidedly different. In the fulfillment of his duty of undivided loyalty to the client, a successor attorney must view the client's situation as of the moment when he is engaged. Hence public policy requires that he not be subjected to any possible conflict of interest which may deter him from determining the best interests of the client by the possibility that he may be held liable for his acts by his predecessor. [Citation.] In contrast, an associate attorney acting as the agent of the principal attorney replaces no one, but acts at the behest of his principal. [¶] Admittedly, he remains bound to act in the best interests of the client, but this creates no unavoidable conflict" for he can make a full disclosure to the principal who, acting in the client's best interest, will "prompt the principal attorney to act in protection of those interests. However, should the principal attorney choose to ignore the client's interests, the agent-associate remains free to terminate the agency relationship and withdraw as associate counsel." (Ibid.)
Justice Johnson dissented from the majority on the ground that no rational distinction could be made between the duties running to successor attorneys and those running to cocounsel. He wrote: "There is a substantial body of law concerning the liability of attorneys who sue each other in connection with common clients. A fiduciary relationship has not heretofore been recognized, and, regardless of legal theory *733 asserted, there has emerged a recurring theme; a client's right to the undivided loyalty of his or her attorneys must be protected, even when the result of such rule is the denial of an attorney's cause of action against another attorney." (Pollack, supra, 120 Cal.App.3d at p. 945, 175 Cal. Rptr. 81 (dis. opn. of Johnson, J.).)
As Justice Johnson observed, "In terms of Mason's public policy rationale, I see no logical distinction that should be based on litigants' status as cocounsel as opposed to successor counsel.... [T]he Mason court relied heavily on the premise that the practice of law remains a profession rather than a business, and that the client's interests must be protected from even the possibility of less than total devotion to his interests by the attorney of his choice." (Pollack, supra, 120 Cal.App.3d at p. 947, 175 Cal.Rptr. 81, fn. omitted (dis. opn. of Johnson, J.), citing Mason v. Levy & Van Bourg (1978) 77 Cal.App.3d 60, 143 Cal. Rptr. 389 (Mason).) Thus, in his opinion, "in balancing the interests of attorneys in protecting their fees and the public policy of protecting clients' rights to receive the undivided loyalty of all counsel who represent them, the wiser course is to reject the recognition of a fiduciary duty between cocounsel." (Pollack, supra, at p. 949, 175 Cal.Rptr. 81.)

Saunders v. Weissburg & Aronson
In Saunders, Attorneys Saunders and Weissburg jointly represented a large group of hospitals on a contingency basis in their litigation against Medicare. The case settled and Saunders received his contractually agreed upon contingency fee. Thereafter, Saunders sued Weissburg, claiming that he had made misrepresentations to Saunders and the group hospitals in order to sway them to accept a detrimental settlement, resulting in a higher recovery by individual hospitals not subject to the contingency fee agreement between Saunders and Weissburg. Thus, claiming that Weissburg breached certain duties owed to cocounsel pursuant to a joint venture agreement between them, Saunders sought to obtain from Weissburg the contingency fee he would had received if the group hospitals had not settled for less than they should have. The trial court granted summary judgment for Weissburg. (Saunders, supra, 74 Cal. App.4th at pp. 870-871, 87 Cal.Rptr.2d 405.)
In affirming the judgment, the Court of Appeal looked to the rationale expressed in Mason, supra, a case rejecting the existence of a duty owed by a successor attorney to a predecessor, and to the dissent in Pollack, supra. In Mason, the defendants were substituted in as attorneys of record in place of the plaintiff in two pending lawsuits. By contract, the plaintiff was to receive a percentage of the contingency fee the client had agreed to pay. Despite offers of settlement, the defendants failed to settle the cases or to prosecute them diligently, resulting in a loss to plaintiff of the agreed upon percentage of any contingency fee. The plaintiff sued the defendants, claiming that they had an obligation to use reasonable diligence to bring the client's cases to settlement or trial. (Mason, supra, 77 Cal.App.3d at pp. 63-64, 143 Cal.Rptr. 389.)
The court in Mason declined to impose such an obligation. It explained: "It is fundamental to the attorney-client relationship that an attorney have an undivided loyalty to his clients. [Citation.] This loyalty should not be diluted by a duty owed to some other person, such as an earlier attorney. While, as a practical matter, both the client and the former attorney stand to benefit from any recovery in the client's action, their interests are not identical.... [¶] If the law were to *734 recognize duties, such as are suggested here, between successive attorneys representing the same client, a multitude of litigation could be spawned with an attendant adverse impact on attorney-client relationships. Every lawyer could blame his problems in a lawsuit on his predecessors. Every lawyer referring a case to another lawyer would be in a position to claim that the negligence of the second lawyer caused a meritorious claim to be lost or settled for an insufficient amount. Public confidence in the legal system may be eroded by the spectacle of lawyers squabbling over the could-have-beens of a concluded lawsuit, even when the client has indicated no dissatisfaction with the outcome. [Fn. omitted.] Considerations of public policy support the conclusion that an attorney's duty of undivided loyalty to his client should not be diluted by imposing upon him obligations to the client's former attorney, or at least obligations greater than the client himself owed to the former attorney." (Mason, supra, 77 Cal.App.3d at pp. 66-67, 143 Cal.Rptr. 389.)
Following the reasoning in Mason, and rejecting the majority view in Pollack, the court in Saunders concluded that recognizing a duty on the part of cocounsel "would be inconsistent with counsel's duty to exercise independent judgment on behalf of the client." (Saunders, supra, 74 Cal.App.4th at p. 874, 87 Cal.Rptr.2d 405.) It rejected Saunders assertion that Weissburg faced no conflict because his duty to the clients was identical to Saunders' duty to them. Noting the clients' apparent satisfaction with Weissburg's representation, and Saunders' dissatisfaction with same, the court held that the recognition of a duty on the part of Weissburg to cocounsel was in potential conflict with his duty of loyalty to the clients. And, it observed that the "spectacle of lawyers squabbling over the could-have-beens of a concluded lawsuit" envisioned by the Mason court (Mason, supra, 77 Cal.App.3d at p. 67, 143 Cal. Rptr. 389) had, in fact, come to pass (Saunders, supra, 74 Cal.App.4th at p. 874, 87 Cal.Rptr.2d 405).
We, too, are convinced that the policy reasons expressed in Mason are valid in the cocounsel context presented here. As happened in Saunders, cocounsel Beck's dissatisfaction with the handling of the Stephenses' case by Wecht and McBee points up the myriad conflicts that may arise among attorneys representing the same clients, and the resulting inability to consider only the clients' best interests. To avoid any detriment to the jointly represented client, it is imperative that no collateral duties arise to interfere with the duty of "undivided loyalty and total devotion" owed to the client. (Saunders, supra, 74 Cal.App.4th at p. 874, 87 Cal. Rptr.2d 405.) Thus, the trial court correctly granted summary judgment for Wecht, because, as a matter of law, he owed no fiduciary duty to Beck.

American Equity's Appeal (No. A092221)
Standing in the shoes of its insured, American Equity brought a claim in intervention against Beck, seeking contribution from Beck under the Uniform Partnership Act of 1994 (Corp.Code, § 16100 et seq.).[1] American Equity claimed that under joint venture principles Beck was liable to it for a share of the settlement it had paid to the Stephenses on Wecht's behalf. The trial court granted summary judgment for Beck on the ground that, just as Wecht owed Beck no fiduciary duty as cocounsel, Beck owed Wecht no such duty. Therefore, it *735 held that American Equity's claim for contribution under statutory partnership principles failed as a matter of law.
American Equity seeks to characterize the relationship of Beck, Wecht and McBee as arising out of a joint venture. Thus, it claims it is entitled to recover from Beck Wecht's pro rata share of the joint venture's "losses." We are not persuaded for several reasons. First, it is beyond dispute that joint venturers are in a fiduciary relationship to one another, with corresponding fiduciary duties. As discussed above in connection with Beck's appeal, sound policy reasons dictate that no such relationship can exist among cocounsel representing the same client. Second, the loss at issue hereliability for attorney malpracticeis not of the sort ordinarily contemplated as a business loss, and no evidence was presented to show that it was contemplated here. And third, a full reading of the various agreements among the attorneys and their clients does not support American Equity's joint venture claim. We discuss each point below.

Fiduciary Nature of Joint Venture Relationships
The parties are in semantic disagreement over whether the undisputed fiduciary relationship that exists among joint venturers is an element of such a venture, or merely a byproduct of it. Whichever way it is viewed, the relationship undoubtedly exists. (See April Enterprises, Inc. v. KTTV (1983) 147 Cal. App.3d 805, 819-820, 195 Cal.Rptr. 421 [setting out the elements of a joint venture without including a fiduciary relationship, but nonetheless recognizing that joint venturers are in a fiduciary relationship], and Stilwell v. Trutanich (1960) 178 Cal. App.2d 614, 618, 3 Cal.Rptr. 285 (Stilwell) [specifying that a fiduciary relationship is an element of a joint venture].)
Acknowledging that this is so, American Equity contends that, notwithstanding the public policies set forth in Mason and Saunders, the existence of a fiduciary relationship among joint venturers is not fatal to its claim. It asserts that the policy concerns expressed in those cases are not present here because, given the procedural posture of the case, there is no longer a risk that the clients' confidences will be revealed or that the attorneys' interest will in any way conflict with the clients'. It contends this is so because neither Beck nor Wecht represented or will represent the Stephenses in their legal malpractice action, thereby eliminating the possibility of divided loyalties; both attorneys represented the Stephenses in the same action and have already testified at depositions, so there is no risk that one of them will violate the attorney/client privilege or improperly disclose client confidences; the underlying litigation is already concluded; and no finding of fault is required to obtain contribution on a joint venture theory, so the tendency toward self-preservation (Holland v. Thacher (1988) 199 Cal.App.3d 924, 930-933, 245 Cal.Rptr. 247) is not a concern.
By looking at the case history retroactively to evaluate the potential for conflict, American Equity misses the point of the policy concerns expressed in Mason, Saunders, and others.[2] In order to further the policy concerns set forth in those *736 cases, the rule that cocounsel shall not owe each other any fiduciary duties must be established from the outset of every such relationship. Only in this way is the client guaranteed the undivided loyalty of each attorney. It would undermine these important policies to look back with the benefit of hindsight, to decide whether the fiduciary relationship can exist or did exist in a given case. As noted by American Equity in its response to Beck's appeal, "it is the potential for conflict from the outset that precludes the development of a fiduciary relationship." (See fn. 2, ante, italics in original.) Thus, American Equity cannot circumvent the prohibition of a fiduciary relationship between cocounsel by seeking to characterize the relationship of the attorneys as arising out of a joint venture.

Nature of Losses
As in a partnership, the members of a joint venture associate as co-owners of a business enterprise, and agree to share profits and losses. (9 Witkin, Summary of Cal. Law (9th ed. 1989) Partnership, § 17, p. 415.) "It has been declared that the sharing of profits and losses in a common enterprise is an indispensable feature of joint venture, and that in its absence, no finding of joint liability can be made." (Id. at § 18, p. 417.) American Equity asserts it is immaterial that the parties' agreements made no provision for the sharing of losses, because it has sometimes been held that even if the agreement does not specifically provide for the manner of sharing losses, the law implies an obligation to bear them in the same proportion as the agreement provides for division of profits. (See, e.g., Stilwell, supra, 178 Cal.App.2d at p. 621, 3 Cal.Rptr. 285.) While this rule will certainly make sense in an ordinary business undertaking, where both profits and losses can be readily expected, it is decidedly less compelling in the context of an agreement to represent clients pursuant to a contingency fee agreement. In such a case, short of losing those costs advanced to the client and time spent preparing the case, there is ordinarily no risk of "loss" to the attorney. If the attorney obtains a recovery for the client, he or she obtains a percentage; if there is no recovery, there is no fee. No evidence was presented to suggest that the parties intended to enter into such an unusual agreement. And, as we discuss below, the language of the agreements do not even support American Equity's assertion that the parties intended to enter into any kind of relationship other than a standard association of attorney.

Agreement Language
"A joint venture is an undertaking by two or more persons jointly to carry out a single enterprise for profit." (Stilwell, supra, 178 Cal.App.2d at p. 618, 3 Cal.Rptr. 285.) "The elements of a joint venture are: (1)[a] joint interest in a common business; (2) with an understanding to share profits and losses; and (3) a right to joint control."[3] (April Enterprises, Inc. v. KTTV, supra, 147 Cal.App.3d at p. 819, 195 Cal.Rptr. 421.) The existence of a joint venture depends on the intention of the parties as indicated in the writing, or if the meaning of the writing is ambiguous, by parol evidence. (See Stilwell, supra, at pp. 621-621, 3 Cal.Rptr. 285, and County of Riverside v. Loma Linda University (1981) 118 Cal.App.3d 300, 313, 173 Cal. Rptr. 371.)
American Equity contends that the language of the agreements between Beck and McBee, and between Beck, McBee and *737 Wecht reveals a clear intent to form a joint venture. We read them otherwise.

Beck/McBee Agreement
The Agreement between Beck and McBee is in letter form from Beck to McBee, on Beck's letterhead, and is entitled, simply, "Agreement." The first paragraph is as follows: "This letter represents our agreement to work together in the above-entitled matter under the terms stated herein, as well as, those terms specified in the Legal Services Agreement [between the Stephenses and Beck.]" The next paragraph sets forth the fee-splitting arrangement, and provides that McBee will advance the costs of suit. Next, the letter sets forth how to handle the association of local counsel, and specifies that McBee will be associated pro hac vice with Beck's firm. The letter goes on to state that, as specified in the Beck/Stephens agreement, the Stephenses "may discharge you at any time by written notice effective when received by yourself. You will provide no further services and advance no further costs on behalf of said parties after receipt of such notice. The parties ... will be obligated to pay you [and] ... [y]ou will be entitled to an attorney's lien.... If there is no recovery, or the recovery is insufficient to reimburse you in full for costs advanced, you will bear the loss." (Italics added.) The letter next informs McBee that he may withdraw at any time as permitted by the rules of professional conduct. Finally, the letter states Beck's belief that "our association will greatly benefit [the Stephenses], which is the most important factor in our pursuit of attaining a recovery against General Motors Corporation."
While this letter may, arguably, contain language to satisfy the first element of a joint venture agreement, that is, a joint interest in a common business, it fails to establish the two remaining elements. The letter, of course, contains an understanding to share profits, i.e., the contingency fee, but says nothing about sharing losses. As discussed above, the only loss ordinarily contemplated in a contingency fee tort action is the loss of advanced costs in the event there is no recovery. The agreement between the parties makes no provision for the sharing of costs. Rather, it specifies that McBee shall pay them. Finally, the letter contains no agreement that the parties have a right to joint control of the enterprise.
One final point convinces us that the Beck/McBee agreement expresses no intention to form a joint venture. As with a partnership, a joint venture cannot be unilaterally dissolved by one of the joint venturers. (Zeibak v. Nasser (1938) 12 Cal.2d 1, 13-14, 82 P.2d 375.) So long as the agreement remains in force, one joint venturer has no right to exclude another, or to unilaterally withdraw from the venture. (Sime v. Malouf (1949) 95 Cal. App.2d 82, 97-98, 212 P.2d 946.) Yet, the agreement specifically provides that McBee may withdraw from his representation of the Stephenses, so long as he complies with the rules of professional conduct. This agreement is precisely what it appears to be: an agreement between counsel to associate for the purpose of representing common clients. It is not a joint venture agreement.

Beck/McGee/Wecht Agreement
The agreement through which Wecht was brought into the litigation is entitled "Agreement re Local Counsel." In pertinent part, it provides that Wecht is being retained by the Stephenses to act as local San Francisco counsel, and that he shall receive 10 percent of the total attorney fees, to be paid pro rata from the respective shares of Beck and McBee. *738 The agreement lists several criteria for selection of local counsel and sets forth his "functions and role." Finally, the agreement provides that "should Plaintiffs' litigation be transferred out of the San Francisco Superior Court to a jurisdiction other than the United States District Court for the Eastern or Northern District of California, McBee and Beck, at their discretion, may employ local counsel other than Wecht ... and, if requested, that Wecht ... will voluntarily substitute out of Plaintiffs' litigation, and ... will then be entitled to a portion of the fees designated for local counsel, that portion to be based upon agreement among McBee, Beck and Wecht, or upon quantum meruit." (First italics added.)
As far as an expression of an intent to form a joint venture, this agreement suffers from the same deficiencies as the Beck/McBee agreement. It contains no agreement to share losses; in fact it does not mention them at all. It does not provide for joint control. And, most significantly, it provides that Beck and McBee can require Wecht's withdrawal if the case is transferred out of the specified courts. Again, this agreement is a standard agreement of association of counsel. Nothing more.

Judicial Estoppel
The applicability of judicial estoppel is perhaps the single most interesting issue presented by these appeals. The original briefs filed in both appeals simply cry out for an answer to the question: "Isn't this argument the exact opposite of that argued in this party's briefs in the other appeal?" Responding to the cry, we asked the parties to file supplemental briefs addressing the issue that was ignored by everyone in the original briefing: "Does the doctrine of judicial estoppel operate to bar either or both of the appeals in this case?" After much reflection we have determined that, notwithstanding the tremendous temptation to penalize the parties for "playing fast and loose with the court" (Jackson v. County of Los Angeles (1997) 60 Cal.App.4th 171, 181, 70 Cal.Rptr.2d 96) the most judicious approach is to reach the merits of the parties' appeals. Therefore, we do not decide the applicability of the doctrine.

Summary and Disposition
In Beck's appeal (A092636) we affirm the trial court's entry of summary judgment in favor of Wecht. As a matter of law, as cocounsel representing the Stephenses in their action against General Motors, Wecht and Beck were not in a fiduciary relationship and owed each other no fiduciary duties. Wecht shall recover his costs on appeal.
In American Equity's appeal (A092221) we affirm the trial court's entry of summary judgment in favor of Beck. The attorneys involved in the prosecution of the Stephenses' actions were not parties to a joint venture agreement. Accordingly, American Equity's claim for statutory contribution under partnership principles failed. Beck shall recover his costs on appeal.
McGUINESS, P.J., and CORRIGAN, J., concur.
NOTES
[*] Judge of the Superior Court of Alameda County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.
[1] Formerly Corporations Code section 15001 et seq.
[2] American Equity misses the point in this appeal, but nails it in responding to Beck's appeal. There it argues that the issue of the potential for conflict between cocounsel "cannot be viewed retroactively, as it is the potential for conflict from the outset that precludes the development of a fiduciary relationship between the attorneys, and leaves each of them free to consider only the interests of the client during the course of his or her representation." (Italics in original.) We discuss the doctrine of judicial estoppel below.
[3] As noted above, some authorities include in the list of elements the existence of a fiduciary relationship. (See, e.g., Stilwell, supra, 178 Cal.App.2d at p. 618, 3 Cal.Rptr. 285.)