109 Cal.Rptr.2d 214 (2001)
90 Cal.App.4th 545
Sandra G. MUSSER, Cross-Complainant and Appellant,
v.
Douglas PROVENCHER et al., Cross-Defendants and Respondents.
No. A088934.
Court of Appeal, First District, Division Two.
July 10, 2001.
Review Granted September 19, 2001.
*216 James A. Murphy, Alexander J. Berline, Murphy, Pearson, Bradley & Feeney, San Francisco, CA., for Appellant.
Christopher R. Miller, Cheryl P. Martinsen, Lanahan & Reilley, LLP, Sacramento, CA., for Respondent.
*215 KLINE, J.

INTRODUCTION
Sandra G. Musser appeals from a judgment of the Marin County Superior Court, following the entry of nonsuit against her cross-complaint for indemnity. She claims the trial court erred in ruling that she could not maintain an indemnity action against her former cocounsel following her settlement of a malpractice claim with their mutual client. Specifically, she contends cocounsel are not barred from seeking equitable indemnity against one another where one counsel has associated another to assist in a particular aspect of the case, and the associated counsel commits malpractice in the course of that representation for which the associating counsel is held liable to the client. She further contends the court erred in ruling that her insurance company, which paid the damages claimed by the client, could not be subrogated to her indemnity cause of action against cocounsel; the court erred in holding that Musser's settlement of the main action with the client barred her from seeking recovery of her fees and the costs incurred in representing the client as an element of damages in her indemnity action against cocounsel; and the court erred in ruling that she could not prove as damages the insurance policy deductible which she paid to the client.

FACTS & PROCEDURAL BACKGROUND[1]
Musser is an attorney who practices family law. She represented Pam *217 Scott in divorce proceedings in 1992. Musser filed a petition for spousal and child support set to be heard on July 17, 1992. At that hearing, Scott's husband declared that he had filed for bankruptcy and the support hearing was continued. Musser arranged for respondent Douglas Provencher, a bankruptcy specialist, to obtain relief from the automatic stay imposed by the bankruptcy court. Provencher did not obtain relief from the stay, but advised Musser that she could proceed with the hearing to set support. Provencher advised Musser that the support hearing would not violate the stay if the court did not enter the support order until after the stay was lifted. This advice was contrary to well-established legal authority. Musser asserts Provencher did not even attempt to research the issue. Acting on Provencher's advice, Musser continued with the hearing, although the family law judge warned her she might be violating the automatic stay in so doing.
Thereafter, Mark Scott appealed the grant of spousal and child support and in an unpublished opinion (In re Marriage of Scott (Feb. 28, 1994) (A059831)), the Court of Appeal reversed the support awards on the grounds they were void ab initio as the hearing setting support violated the automatic stay.
Facing punitive damages for violation of the automatic stay, Scott settled with her former husband for less than the original support order. She then sued Musser for malpractice and breach of contract. Musser cross-complained against Scott for past-due attorney fees and costs. Musser moved for summary judgment on the ground that Scott had not sued the sole negligent party, Provencher. The court denied Musser's summary judgment motion, finding Musser was vicariously liable for Provencher's negligence.
Musser requested that Provencher and his insurance carrier contribute to a settlement offer to Scott, but Provencher refused. Musser then filed a cross-complaint against Provencher for indemnity and settled the case with Scott. Mark Scott also filed a complaint against Musser for her part in the violation of the automatic stay. Musser again requested Provencher and his insurer to contribute to a settlement but was again refused. Musser then amended her cross-complaint against Provencher to allege these additional damages, and settled with Mark Scott.
The settlements paid to Pam and Mark Scott included $85,000 ($10,000 of which was paid directly by Musser as her insurance policy deductible) and $20,000 in waived legal fees and costs. In addition, Musser and her insurer, Home Insurance Company (hereafter Home) spent $62,000 in defending both malpractice actions.[2]
Musser's "First Amended Cross Complaint for Indemnity" against Provencher alleged three causes of action: implied contractual indemnity, equitable indemnity, and tort of another. The first two sought as damages the money paid by Musser and Home and the $20,000 in waived fees and costs.[3] The tort of another cause of action sought $62,000 expended in defending the malpractice actions. Provencher answered, raising several affirmative defenses, including that Musser had violated Code of Civil Procedure section 389 in failing to join Home as a party, since Home paid all but the $10,000 deductible toward the settlement and that Musser had split her cause of action for *218 waived fees because Musser had failed to name Provencher in her cross-complaint against Scott for fees. He also raised statute of limitations defenses. In November 1997, Musser moved for summary adjudication as to several of Provencher's affirmative defenses. After hearing, Judge Gary W. Thomas ruled that Home was "in essence" a party to the action, and was authorized to sue in Musser's name; that Musser had not split her cause of action, as the same cause of action was not involved in Musser's fee action against Scott and her indemnity action against Provencher. The court also ruled that the action against Provencher was not barred by res judicata or collateral estoppel for the same reason. The judge also ruled in favor of Musser on the statute of limitations issue, finding the indemnity causes of action within the limitations period and that the "tort of another" cause of action was for malpractice, the statute of limitations for which was triggered by discovery so that triable issues of fact remained as to when Musser discovered her actual harm.
By January 1999, Provencher was represented by new counsel and the case had been transferred to a new trial judge. In pretrial motions in limine, Provencher moved to bar Musser from seeking damages based on the settlements because Home and not Musser had paid the settlement. Provencher also urged that Musser had waived her claim for fees in the settlement and that the dismissal with prejudice following settlement barred Musser's fee and cost claim. Finally, he argued that the action was in reality a legal malpractice action which could not be assigned to Home. Musser argued these issues had been decided in the summary adjudication motion and that the new motion was therefore an impermissible motion for reconsideration, made without new law or facts.
Judge Vernon F. Smith ruled that the action was in fact a legal malpractice claim that could not be assigned to the insurer. Therefore, Musser could not introduce evidence of the settlements paid by Home. Judge Smith further found that Musser could not introduce evidence of fees and costs she had waived when she settled with Scott and that the dismissal with prejudice following the settlement included those waived fees and costs. These rulings effectively struck all damage claims, except for the $10,000 deductible paid by Musser personally. Thereafter, on April 29, 1999 the trial court granted a motion for nonsuit as to the $10,000 deductible claim, preventing that damage claim from being presented to the jury. On October 26, 1999, following its grant of nonsuit on all Musser's claims, the court entered judgment against Musser and in favor of Provencher on Musser's cross-complaint. This timely appeal followed.

DISCUSSION

I.
A. The threshold question is whether cocounsel may sue each other for indemnity in these circumstancesthe particular circumstances in this case being that Musser hired Provencher to assist with the bankruptcy aspect of the case, Musser and not Provencher was sued by their mutual client Scott for malpractice to which both attorneys allegedly contributed, and that Musser settled with Scott.
Numerous decided cases have addressed variations of the issue of when one attorney may sue another for malpractice or breach of fiduciary duty in connection with the representation of a mutual client. These cases have come to somewhat different conclusions. (See, e.g., Shaffery v. Wilson, Elser, Moskowitz, Edelman & Dicker (2000) 82 Cal.App.4th 768, 98 Cal. *219 Rptr.2d 419 [discussing cases in detail]; Saunders v. Weissburg & Aronson (1999) 74 Cal.App.4th 869, 87 Cal.Rptr.2d 405; Kroll & Tract v. Pans & Paris (1999) 72 Cal.App.4th 1537, 86 Cal.Rptr.2d 78; Pollack v. Lytle (1981) 120 Cal.App.3d 931, 175 Cal.Rptr. 81.)
One "well-recognized exception to the ordinary rules of implied equitable indemnity has been established: A cross-complaint will not be permitted where an attorney sued for malpractice by a former client seeks indemnification from a successor attorney hired by the client to extricate him or her from the situation allegedly caused by the first attorney. [Citations.]" (Kroll & Tract v. Paris & Paris, supra, at p. 1541, 86 Cal.Rptr.2d 78.) "The various public policy reasons supporting this exception have been pointed out in several cases: `Among them are (1) the threat of such a lawsuit by a client's adversary impinges upon the individual loyalty of the second attorney in advising his client ...; (2) one consequence of such a cross-complaint is to preclude the second attorney from trying the lawsuit, thus depriving the party of the attorney of his choice ...; (3) the threat of such a cross-complaint results in the injection of undesirable self-protective reservations into the [second] attorney's counseling role, thereby diminishing the quality of legal services received by the client ...; and (4) such lawsuits jeopardize the policy of encouraging confidence and preserving inviolate the attorney-client relationship....' [Citation.]" (Kroll & Tract v. Paris & Paris, supra, at p. 1542, 86 Cal.Rptr.2d 78.)
Musser contends that the policy reasons underlying the exception prohibiting predecessor attorneys from suing successor attorneys for indemnification do not apply to cocounsel seeking indemnification. Musser relies primarily upon Pollack v. Lytle, supra, 120 Cal.App.3d 931, 175 Cal. Rptr. 81 [Pollack] and Crouse v. Brobeck, Phleger & Harrison (1998) 67 Cal.App.4th 1509, 80 Cal.Rptr.2d 94 [Crouse] to support her argument.
In Pollack, supra, 120 Cal.App.3d 931, 175 Cal.Rptr. 81 the court considered an attorney's duty to concurrent counsel. There, the plaintiff attorney (Pollack) represented his client in a medical malpractice lawsuit on a contingency fee basis. The plaintiff associated the defendant attorney, Lytle, as trial counsel, relying upon Lytle's false representations that he would obtain a qualified neurosurgeon to testify in the action in exchange for one-third of Pollack's contingent fee. (Id. at p. 936, 175 Cal.Rptr. 81.) Lytle did not properly prepare the case for trial. Unaware of this, Pollack and the client rejected a $250,000 pretrial settlement offer. Due to Lytle's conduct of the trial, the jury returned a defense verdict in the medical malpractice action. Lytle then induced the client to sue Pollack for legal malpractice. Pollack sued Lytle for breach of fiduciary duty, fraud, breach of contract, legal malpractice, and declaratory relief. The Court of Appeal, over a strong dissent, reversed the trial court's sustaining of a demurrer.
The Court of Appeal held that Pollack could maintain a suit for indemnity against Lytle, concluding that simple agency principles governed the relationship of associate counsel in the circumstances presented. (Id. at pp. 940-943, 175 Cal.Rptr. 81.) Acknowledging the "growing body of law which holds, as a matter of public policy, that a successor attorney owes no duty to his predecessor" (id. at p. 942, 175 Cal. Rptr. 81), the majority found the policy rationale of those cases inapplicable to the role of associate counsel. "The roles of successor and associate attorneys are decidedly different. In the fulfillment of his duty of undivided loyalty to the client, a *220 successor attorney must view the client's situation as of the moment when he is engaged. Hence public policy requires that he not be subjected to any possible conflict of interest which may deter him from determining the best interests of the client by the possibility that he may be held liable for his acts by his predecessor." [Citation.] In contrast, an associate attorney acting as the agent of the principal attorney replaces no one, but acts at the behest of his principal, [¶] "Admittedly, he remains bound to act in the best interests of the client, but this creates no unavoidable conflict. Should he find that the principal attorney's actions to date pose a potential danger to the client's best interests, the agent-associate is dutybound to make the fullest disclosure of these material facts to the principal attorney.... [S]hould the principal attorney choose to ignore the client's interests, the agent-associate remains free to terminate the agency relationship and withdraw as associate counsel. Furthermore, the associate attorney's duty to exercise reasonable professional care, skill and diligence on behalf of the client is precisely equivalent to the duty he owes his principal in dealing with the subject matter of the agency. Accordingly, public policy considerations do not mandate that an associate remain free from liability for a breach of the duty owed to his principal." (Id at pp. 942-943, 175 Cal.Rptr. 81.)
The Pollack court reasoned that "Molding that an associate attorney owes no duty to anyone but the client would create the potential for a battle of wills over promotion of the client's interests, a situation which could well rebound to the client's detriment, for the determination of a client's best interests is at best a subjective value judgment upon which reasonable minds could differ. Moreover, in view of the principal attorney's liability for the acts of subordinate counsel under the doctrine of respondeat superior, it would be manifestly unfair to relieve an agent-associate of accountability to his principal. [¶] An application of agency principles to the relationship of an associate attorney with the principal attorney would entitle plaintiff to indemnification from defendant as to liability resulting from his tortious conduct. The right to indemnity is implied from the relationship of the parties. [Citations.] Absent the public policy considerations found in the relationship of predecessor-successor attorneys, there is no reason to deny a principal attorney the benefit of indemnity." (Id. at p. 943, 175 Cal.Rptr. 81.) In sum, although the majority agreed that prior decisions precluded an implied duty to successor counsel for policy reasons, it concluded that the duty owed by associated counsel arose from the specific express agency relationship created by contract. Consequently, the claim of a breach of fiduciary duty could be supported by a duty arising from the agency relationship. (See 1 Mallen & Smith, Legal Malpractice (5th ed.2000) § 5.9, pp. 541-542.)
In dissent, assigned Justice Barbara Jean Johnson warned that recognizing a duty between cocounsel would create unavoidable conflicts. (Pollack, supra, 120 Cal.App.3d at p. 948, 175 Cal.Rptr. 81 (dis. opn. of Johnson, J.).) "In terms of ... public policy rationale, I see no logical distinction that should be based on litigants' status as cocounsel as opposed to successor counsel...." (Id. at p. 947, 175 Cal.Rptr. 81 (dis. opn. of Johnson, J.).) "Regardless of context, the underlying rationale ..., that the possibility of a cause of action for indemnity in legal malpractice cases, whether sought against a predecessor or successor attorney, would create such potentially burdensome conflicts of interest for an attorney representing a client, public policy dictates that such a *221 cause of action should be barred." (Id. at p. 948, 175 Cal.Rptr. 81 (dis. opn. of Johnson, J.).) "The potential for conflict is manifest. By recognizing a fiduciary duty between cocounsel the exposure of attorneys to liability is increased, thus placing them in an untenable position of divided loyalties to their clients and associated counsel." (Id. at p. 949, 175 Cal.Rptr. 81 (dis. opn. of Johnson, J.).) Nonrecognition of a duty to cocounsel "may seem to impose a harsh burden on a wronged attorney. However, in balancing the interests of attorneys in protecting their fees and the public policy of protecting clients' rights to receive the undivided loyalty of all counsel who represent them, the wiser course is to reject the recognition of a fiduciary duty between cocounsel." (Id. at p. 949, 175 Cal.Rptr. 81 (dis. opn. of Johnson, J.).)
In Crouse, supra, 67 Cal.App.4th 1509, 80 Cal.Rptr.2d 94, the Court of Appeal held that a successor law firm and partner sued for malpractice by a former client may seek indemnity from a predecessor attorney and firm who has also been sued by the client. The appellate court reasoned that the policy concerns underlying cases refusing to allow predecessor attorneys to seek equitable indemnity from successor attorneys (that is, concerns that the threat of an indemnity suit against the subsequent attorney would create conflicts of interest for the subsequent attorney and difficult problems for him or her in protecting privileged communications and work product) "do not appear applicable when, as here, the subsequent attorney seeks equitable indemnity against the former attorney. The former attorney is not subject to any conflict of interest and has no continuing privileged communications or work product to protect." (Id. at pp. 1545-1546, 80 Cal.Rptr.2d 94.) The Crouse court distinguished Munoz v. Davis (1983) 141 Cal.App.3d 420, 190 Cal. Rptr. 400 (Munoz) in which the subsequent attorney tortfeasor was not allowed to seek indemnity from the original tortfeasor. In Munoz, the original tortfeasor was the driver of a car involved in a collision in which the client, a passenger, had been injured. The attorney retained by the client failed to timely file an action against the original tortfeasor and was sued for malpractice by the client. In refusing to allow the attorney to seek indemnity from the original tortfeasor, the appellate court reasoned that the two were not jointly and severally liable for the same injury and it would not impose a duty on the original tortfeasor for harm resulting when the client's legal claims were incompetently managed. (Munoz, supra, at pp. 425-27, 190 Cal.Rptr. 400.) Moreover, permitting indemnity for subsequent malpractice would create irreconcilable obligations for the original tortfeasor's attorney who is obligated to protect the tortfeasor's interest, but at the same time would be required to assure that the claim against the tortfeasor was competently managed or expose the client-original tortfeasor to a subsequent indemnity claim from the victim's attorney. (Id. at pp. 427-430, 190 Cal.Rptr. 400.) The Crouse court found Munoz distinguishable on the ground that "[t]he negligence of the original tortfeasor did not cause or contribute to the subsequent malpractice of the attorney, and because there was no nexus between the conduct of the original tortfeasor and the attorney there was no joint and several liability between them for the two distinct injuries. [Citations.]" (Crouse, supra, 67 Cal.App.4th at p. 1547, 80 Cal.Rptr.2d 94.) In contrast, in Crouse, the alleged negligence of the predecessor and successor law firms "contributed to or solely caused the single injury" to the client. (Ibid.) The Crouse court recognized a theoretical possibility that the former lawyers would have to protect their *222 former client from malpractice by her new attorneys, but looked at the specific factual allegations involved to find no substantial ethical dilemma. "[A]t least in the context of this case, we are not persuaded that the dilemma is sufficiently real to overcome the general principles of [American Motorcycle Assn. v. Superior Court (1978) 20 Cal.3d 578, 146 Cal.Rptr. 182, 578 P.2d 899]." (Id. at p. 1547, 80 Cal.Rptr.2d 94.)
Pollack and Grouse were distinguished by the court in Kroll & Tract v. Paris & Paris, supra, 72 Cal.App.4th 1537, 86 Cal. Rptr.2d 78 [Kroll & Tract]. In Kroll & Tract an insured company that had been sued successfully brought a legal malpractice action against the law firm retained by the company's insurer subject to a reservation of rights (Kroll & Tract). The company did not sue its independently retained counsel (Paris & Paris) although both firms actively participated in the defense of the company until just before trial when Kroll & Tract took over. Kroll & Tract cross-complained against Paris & Paris for equitable indemnity. The Court of Appeal affirmed an order dismissing the cross-complaint, rejecting plaintiff Kroll & Tract's claim that the policy reasons that preclude the first lawyer from cross-complaining against the successor lawyer are not present were two lawyers shared responsibility in the underlying action in which the client claims the malpractice occurred and where neither of the lawyers is representing the client in the malpractice action. (Id. at p. 1542, 86 Cal.Rptr.2d 78.) The court reasoned that although the two counsel "shared the common goal of defending [the client] in the underlying lawsuit, they filled separate roles." Kroll & Tract was hired by the insurer who provided a defense under a reservation of rights, while Paris & Paris, was the client's personal counsel, and remained as Cumis[4] counsel. (Id. at p. 1542, 86 Cal.Rptr.2d 78.) "The insurance defense attorney is placed in a position of conflict, however, when issues of coverage are asserted by the insurer through a reservation of rights.... [¶] ... `Since it is almost unavoidable that, in the course of investigating and preparing the insured's defense to the third party's action, the insured's attorney will come across information relevant to a coverage or similar issue, it is quite difficult for an attorney beholden to the insurer to represent the insured where the insurer is reserving its rights regarding coverage....' [Citation.]" (Id. at pp. 1542-1543, 86 Cal.Rptr.2d 78.) "[T]he issues of undivided loyalty, self-protective tendencies, and the preservation of the attorney-client privilege remain under these circumstances." (Id. at p. 1542, 86 Cal.Rptr.2d 78.) Rejecting the contention that because Paris & Paris no longer represented the company, the Cumis considerations no longer applied, the court observed that "[t]he possibility that the interests of the insured may become adverse to those of the insurer, and thus to those of the insurer's attorney is exactly the reason Cumis counsel exists. (See Rowell v. Transpacific Life Ins. Co. (1979) 94 Cal.App.3d 818 [156 Cal.Rptr. 679]....)" (Id. at pp. 1543-1544, 86 Cal. Rptr.2d 78, italics added.) The Kroll & Tract court also expressed concern about the impact of allowing the indemnity cross-complaint on client confidences. The court observed that the client had "expressly preserved the [attorney-client] privilege as to Paris & Paris by choosing not to sue it for malpractice. [Citation.] If the indemnity action were allowed, Paris *223 & Paris would be unable to defend itself to the extent that its actions depended upon client communications ..." (Id. at p. 1544, 86 Cal.Rptr.2d 78.)
The appellate court in Kroll & Tract distinguished Pollack, supra, 120 Cal. App.3d 931, 175 Cal.Rptr. 81, on the ground that Pollack was decided on an agency theory; "the first attorney had hired the second to assist him with an expert witness in a medical malpractice case in return for a percentage of the first attorney's contingency fee. Thus, the second attorney had an agent's duty to his principal." (Kroll & Tract, supra, at p. 1545, 86 Cal.Rptr.2d 78.)
The court also noted that "[t]he threat of an adversarial relationship (and the concomitant conflict between the attorney's duty to the client and his or her self-protective instincts) is a significant factor when considering the applicability of the indemnity prohibition in diverse factual situations, more significant than the chronological relationship of the parties." (Id. at p. 1544, fn. 4, 86 Cal.Rptr.2d 78, citing Major Clients Agency v. Diemer (1998) 67 Cal.App.4th 1116, 79 Cal.Rptr.2d 613 in which the court held the same public policy considerations present in the subsequent attorney malpractice cases were applicable to the concurrent representation of a client by an agent and an attorney and barred the agent's action against the client's attorney for negligence because the agent "was a potential adverse party on the issue of commission obligations by [the] client to [the agent]." (Id. at pp. 1132-1133, 79 Cal.Rptr.2d 613.).)
In distinguishing Crouse, Kroll & Tract contrasted the concurrent representation situation with the suit against the dissatisfied client's former attorney in Crouse. Although the Kroll & Tract court was "not prepared to agree with the Crouse court's sweeping statement" that the policy reasons prohibiting an indemnity claim by the predecessor attorney against the subsequent attorney do not apply to suit by the subsequent attorney against the former attorney, the court, nevertheless agreed that "the particular facts in Crouse showed there were no conflicting duties during the former attorney's representation of the dissatisfied client, thus the court's result was correct." (Id. at p. 1544, fn. 4, 80 Cal.Rptr.2d 94.) Similarly, the court observed that although it agreed with the holding in Major Clients, "we do not suggest that a cross-complaint for indemnity would never be allowed against an attorney involved in the concurrent representation of a joint client." (Ibid)
The Kroll & Tract court would appear to advocate examination of the particular facts of the case to determine whether at the time of the concurrent representation, as well as thereafter, there were actual or potential conflicts in the duties or roles of the concurrent counsel which could present a conflict of interest, a potential for violation of privileged communications with the client, or a conflict between the attorney's duty to the client and his or her self-protective instincts.
Kroll & Tract was followed in Shaffery v. Wilson, Elser, Moskowitz, Edelman & Dicker, supra, 82 Cal.App.4th 768, 98 Cal. Rptr.2d 419 (Shaffery). In that case, an insurer filed a malpractice action against an attorney it had hired, who unsuccessfully represented an insured in an employee's action against the insured. That attorney filed a cross-complaint for indemnity against a second law firm also hired by the insurer to act as "monitoring counsel" in the underlying action. The Court of Appeal affirmed the trial court's dismissal of the sued attorney's indemnity action against the monitoring counsel following sustaining of a demurrer. The appellate court held the same policy considerations *224 underlying the rule barring indemnity suits by former counsel against successor counsel on the same matter barred the lawyer hired by the insurer and sued by the insurer from seeking indemnity from the monitoring counsel. The court relied upon Kroll & Tract, stating: "it is immaterial that, from one case to the next, the parties are not in precisely the same position as the parties in the other reported decisions. In substance if not in form, we find the case before us analytically indistinguishable from Kroll & Tract v. Paris & Paris ..., and conclude the result must be the same." (Id. at p. 778, 98 Cal.Rptr.2d 419.)
Finally, in Saunders v. Weissburg & Aronson, supra, 74 Cal.App.4th 869, 87 Cal.Rptr.2d 405 (Saunders), the court held that a law firm associating with a second law firm to jointly represent the client hospital in contingency fee litigation against the Medicare Program could not sue the second firm for breach of fiduciary duty, fraud, negligence and other claims. The associated firm had alleged it was injured when, as a result of the second firm's manipulation of the case and misrepresentations, the matter was settled for less than its true value, lessening the contingency fee the associated attorney would have received had the matter not been settled for less than it was worth. (Id. at pp. 870-871, 87 Cal.Rptr.2d 405.) Relying upon the line of cases holding that a successor attorney has no duty to his predecessor, the court found Justice Johnson's dissenting opinion in Pollack more soundly reasoned than the Pollack majority. (Id. at p. 874, 87 Cal.Rptr.2d 405.) The Saunders court reasoned that contrary to the distinction posited in Pollack between concurrent counsel and successor counsel, "the duty of both the associate and successor attorney is the same: to serve the best interests of the client." (Id. at p. 873, 87 Cal.Rptr.2d 405.) The "`client's interests must be protected from even the possibility of less than total devotion to his interests by the attorney of his choice.'" (Id. at p. 874, 87 Cal.Rptr.2d 405, quoting Pollack, supra, 120 Cal.App.3d at p. 947, 175 Cal.Rptr. 81, fn. omitted. (Dis. opn. of Johnson, J.).)
Looking at the facts before it, the Saunders court rejected the plaintiff attorney's claim that the defendant firm's duties to the client were precisely the same as its duty to cocounsel, so that it was faced with no conflict. The record indicated that the clients were satisfied with the defendant firm's representation, but that plaintiff attorney was not. "That surely indicates that recognition of a duty on the part of [defendant firm] to its cocounsel potentially conflicts with [defendant firm's] duty to its clients of undivided loyalty and total devotion to their interests. Indeed, the Mason [v. Levy & Van Bourg (1978) 77 Cal.App.3d 60, 143 Cal.Rptr. 389] court envisioned just this situation in observing that `Public confidence in the legal system may be eroded by the spectacle of lawyers squabbling over the could-have-beens of a concluded lawsuit, even when the client has indicated no dissatisfaction with the outcome.' (Mason v. Levy & Van Bourg, supra, 77 Cal.App.3d at p. 67 [143 Cal. Rptr. 389].)" (Saunders, supra, at p. 874, 87 Cal.Rptr.2d 405.)
Although the Saunders court adopted the reasoning of Justice Johnson's dissent in Pollack, which would appear to embrace a rule barring all indemnity actions between cocounsel for alleged malpractice, neglect or breach of fiduciary duty arising from their concurrent representation of a client, Saunders did not itself involve an indemnity claim. The client in Saunders did not initiate an action against the suing counsel. Rather, the case involved an independent action by associated attorney against cocounsel for the loss of fees expected *225 by the associated counsel. Plaintiff counsel was seeking nothing less than the recognition of a duty between cocounsel to do nothing during the course of representing the mutual client which might impact the other's fee expectation. The facts in that case presented a manifest potential for conflict between counsel's duty to the client and the asserted duty to cocounsel, should the court recognize such a duty.[5]
We believe the facts of this case and the attendant policy concerns are more like those present in Pollack and Crouse than those presented by Saunders, Kroll & Tract or Shaffery. As tempting as it may be to avoid a case-by-case analysis of the potential conflicts which were raised in a particular concurrent representation in favor of a general rule, we believe that the concurrent representation situation presents a much less certain potential for conflict of interest than where predecessor counsel seeks indemnity from successor counsel. Like the plaintiff attorney in Pollack and Crouse and unlike the plaintiff attorney in Saunders, Musser was sued by the client for malpractice. Like the plaintiff in Pollack, Musser associated Provencher to perform a particular and specialized role in the pursuit of the client's interests and is seeking indemnity under usual principles of agency for the portion of damages allegedly caused by Provencher's malpractice and breach of fiduciary duty. Unlike the relationships between cocounsel in Saunders, Kroll & Tract and Shaffery, we cannot see at any time during the joint representation of Scott by Musser and Provencher that there was a real potential for conflict of interest between Provencher's duties to Scott and his duties to Musser. Moreover, Musser was sued not simply for her own asserted neglect in the case, but also under a respondeat superior theory for damages caused by Provencher's malpractice. It would appear extremely unjust to bar Musser from seeking indemnity or contribution from Provencher when Musser was sued by Scott for damages allegedly attributable to Provencher's tortious conduct, absent a real potential for conflict between Provencher's duty to Scott and his duty to Musser during the course of their joint representation or of a real impact upon attorney-client confidentiality presented by Musser's indemnity action. We are convinced that attorney-client confidentiality concerns are not affected here.
In Kroll & Tract, the court was concerned that the attorney-client priviledge would render the defendant lawfirm unable to defend itself to the extent its actions depended upon client privileges. It is true that in this case, as in Kroll & Tract, the client did not sue the defendant attorney for malpractice. Kroll & Tract held that by choosing not to sue the defendant attorney, the client in that case "expressly preserved the privilege" as to that firm. (Id. at p. 1544, 86 Cal.Rptr.2d 78.) The appellate court refused to speculate on the intent of the client in making communications relevant to the joint representation where such communications were unrevealed to the court. Consequently, that court rejected the plaintiff firm's contention that such communication might be excluded from the privilege. (Id. at p. 1545, 86 Cal.Rptr.2d 78.)
Here, Mussser asserts that Scott has expressly waived her attorney-client privilege with Provencher, whom she had not sued, by expressly waiving these rights in *226 her settlement with Musser. The record supports this assertion insofar as this instant litigation against Provencher is concerned. The "Settlement Agreement and Mutual Release" between Scott and Musser, executed in October 1996, provides in relevant part that Scott waives her attorney-client privilege as to the dissolution files and that Musser will have full access to those files before and during trial; that Scott's family waives their attorney-client privilege with the Cooley Godward firm, limited to the facts and circumstances under which Provencher was initially retained; and that Scott will stipulate to allow a cross-complaint to be filed against Provencher in the litigation and will cooperate with Musser's prosecution of the cross-complaint, including entering into a reasonable witness agreement in lieu of being subpoenaed for trial. At Provencher's deposition, taken in connection with this litigation, it was asserted that Scott had "waived the attorney-client and work product privileges and doctrines solely as to your [Provencher's] initial retention and your work done on getting relief from the stay and the later motion for relief nunc pro tunc, and the following motion for reconsideration. But that your work on her bankruptcy estate, which is not germane to this action, that the privilege still is in effect." Counsel for Musser and Provencher both acknowledged that that was correct.[6]
Therefore, it appears that Scott has waived the privilege with respect to Provencher's representation of her in the bankruptcy portion of the dissolution action. Insofar as she continues to assert the privilege in connection with her personal bankruptcy, the parties apparently agreed that that Provencher's representation of Scott in her personal bankruptcy was not germane to this action.
In these circumstances we see no public policy that would be advanced by barring Musser from maintaining this indemnity cross-action against Provencher.

II.
Our conclusion that Musser is not as a matter of law precluded from pursuing an equitable indemnity claim against Provencher does not resolve this appeal. Musser contends that the trial court also erred in ruling that Home could not be subrogated to her indemnity cause of action against Provencher. In the unusual circumstances of this case, we agree with Musser that Home was entitled to pursue its action to recover amounts it paid to settle and defend the Scott action on Musser's behalf as Musser's subrogee.
It is the general rule in this state that legal malpractice claims are nonassignable and that subrogation is subject to the prohibition against assigning legal malpractice actions. (E.g., Fifield Manor v. *227 Finston (1960) 54 Cal.2d 632, 7 Cal.Rptr. 377, 354 P.2d 1073; American Casualty Co. v. O'Flaherty (1997) 57 Cal.App.4th 1070, 67 Cal.Rptr.2d 539; Fireman's Fund Ins. Co. v. McDonald, Hecht & Solberg (1994) 30 Cal.App.4th 1373, 36 Cal.Rptr.2d 424; Goodley v. Wank & Wank, Inc. (1976) 62 Cal.App.3d 389, 133 Cal.Rptr. 83; see 1 Mallen & Smith, supra, § 7.12, pp. 720-721 and cases cited fn. 12.)
Goodley v. Wank & Wank, Inc., supra, is the seminal case which articulates the policy considerations underlying the rule, which relate to the uniquely personal nature of the attorney-client relationship. (Fireman's Fund Ins. Co. v. McDonald, Hecht & Solberg, supra, at p. 1379, 36 Cal.Rptr.2d 424; Kracht v. Perrin, Gartland & Doyle (1990) 219 Cal.App.3d 1019, 1023, 268 Cal.Rptr. 637.) In Goodley the client assigned her rights against her attorneys for their negligence in handling her divorce. The court held that important policy reasons preclude assignment of the client's action for legal malpractice. "It is the unique quality of legal services, the personal nature of the attorney's duty to the client and the confidentiality of the attorney-client relationship that invoke public policy considerations in our conclusion that malpractice claims should not be subject to assignment." (Goodley v. Wank & Wank, Inc., supra, at p. 397, 133 Cal.Rptr. 83.) "`Goodley noted the attorney owes a duty of undivided loyalty and diligence in representing the client. Such duty is personally owed by the attorney and may not be delegated to others, and is owed solely to the client, [the attorney's] one intended beneficiary. Assignability would encourage commercialization of claims, and would force attorneys to defend themselves against persons to whom no duty was ever owed. Moreover, the legal profession is debased by such commercialization, because it could (1) encourage unjustified lawsuits; (2) generate increased malpractice lawsuits, burdening the profession, the court system and (to the extent malpractice premiums would inevitably rise and be passed to the consumers) the public; and (3) promote champerty. [Citation.] Assignability could conceivably reduce the public's access to legal services, since the ever present threat of assignment by irresponsible clients (seeking quick financial gain) could cause lawyers to evaluate more selectively the desirability of representing a particular client. [Citation.]' (Kracht v. Perrin, Gartland & Doyle, supra, at pp. 1023-1024 [268 Cal.Rptr. 637].)" (Fireman's Fund Ins. Co. v. McDonald, Hecht & Solberg, supra, at p. 1379, 36 Cal.Rptr.2d 424.) "The policy considerations underlying the Goodley decision usually have been persuasive for the courts that have considered the issue." (1 Mallen & Smith, supra, § 7.12, p. 720, fn. omitted.)[7]
*228 The foregoing policy concerns underpin the rule prohibiting a third party from succeeding to the client's cause of action for legal malpractice against his or her former attorney. They have no application here, where the insurer is not seeking to succeed to the rights of the client against counsel, but to its insured attorney's right to seek indemnity from cocounsel for the proportionate fault of the latter.
The rule against assignability and subrogation of legal malpractice actions should be contained by the context in which the rule arosethat of a third party (including the client's insurer) attempting to succeed to the client's legal malpractice action against the client's former attorney. We decline to extend the rule beyond this context to prohibit an insurer from subrogating to the right of its insured non-client attorney to bring an action for indemnity against a specialist associated by the attorney to provide assistance in representing the mutual client.
Respondent relies upon Fireman's Fund Ins. Co. v. McDonald, Hecht & Solberg, supra, 30 Cal.App.4th 1373, 36 Cal.Rptr.2d 424 (Fireman's Fund) in support of his argument that the rule against subrogation of legal malpractice claims applies here. In Fireman's Fund, having been held liable to homeowners, developer clients sued their former law firm for legal malpractice and the clients' insurers sought to assert a cause of action in subrogation. The Court of Appeal affirmed the dismissal of the insurers as plaintiffs, holding that legal malpractice claims are not assignable or subject to subrogation absent express statutory authorization.
The insurer subrogee argued that its "interests were `aligned' or `virtually identical' with (and indeed `derivative' of) the insured [client's] interests against the attorney." (Id. at p. 1380, 36 Cal.Rptr.2d 424.) Acknowledging that the insurer's policy arguments "have substance" (ibid), the court nevertheless pointed out that the prohibition on assignment was "`well settled'" (ibid) and explained that "we are not the proper tribunal to depart from established law." (Id. at p. 1381, 36 Cal. Rptr.2d 424.) "California courts have consistently held legal malpractice claims are nonassignable to protect the integrity of the uniquely personal and confidential attorney-client relationship. [Citations.] Further, under principles of stare decisis we are bound to follow the Supreme Court's holding in Fifield Manor v. Finston, supra, 54 Cal.2d 632 [7 Cal.Rptr. 377, 354 P.2d 1073], that absent express statutory authorization nonassignable claims are not subject to subrogation. (Auto Equity Sales, Inc. v. Superior Court (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937]....)" (Fireman's Fund, supra, 30 Cal.App.4th at p. 1383, 36 Cal.Rptr.2d 424, fn. omitted.)
*229 Again, a critical distinction from Fireman's Fund is that Musser (the party to whose rights Home is subrogating) is not the client. The client, Scott, has already sued Musser for professional negligence, and that suit encompassed the negligence of Provencher under a theory of respondeat superior.
Fireman's Fund itself noted the "rule allowing an insurer to be subrogated to a vicariously liable employer's cause of action against an employee for recoupment. (Continental Cas. Co. v. Phoenix Const. Co [1956] 46 Cal.2d 423 [296 P.2d 801].)" (Id. at p. 1387, fn. 15, 36 Cal.Rptr.2d 424.) However, it distinguished that situation on the facts, pointing out that the "Law Firm [defendant] was not Insured's [the plaintiff client subrogors'] employee and, moreover, in the Homeowners action liability was imposed on Insureds not vicariously under the doctrine of respondeat superior but instead for Insureds' own conduct...." (Ibid.)
The situation distinguished in Fireman's Fund is almost precisely the case here. Musser (the insured) was in a real sense the "employer" of Provencher. She hired him to provide bankruptcy advice to her in her representation of Scott. She was sued by Scott not only for her own alleged negligence, but also based upon the theory that she was liable for mistakes made by Provencher. Consequently, the client sought to impose liability on Musser for Provencher's neglect "vicariously under the doctrine of respondeat superior" as well as for Musser's own conduct.
Similarly, the Supreme Court in Fifield Manor v. Finston, supra, 54 Cal.2d 632, 7 Cal.Rptr. 377, 354 P.2d 1073, the case relied upon by Fireman's Fund for the proposition that claims which are not assignable are not subject to subrogation, also acknowledged the holding of Continental Cas. Co. v. Phoenix Const. Co., supra, 46 Cal.2d 423, 296 P.2d 801, that "an employer's insurer who had paid a judgment against the act of his employee was subrogated to the employer's cause of action for recoupment against the employee or the employee's insurer. (46 Cal.2d 429 [296 P.2d 801].)" (Id. at p. 642, 7 Cal.Rptr. 377, 354 P.2d 1073.) "The employer's cause of action against the employee in such circumstances is based upon the breach of the servant's duty to his master and is one for indemnification [citations]...." (Id. at pp. 642-643, 7 Cal.Rptr. 377, 354 P.2d 1073.)
We understand Fireman Fund's reluctance to depart from settled law prohibiting assignment or subrogation of a client's malpractice claim against counsel, even though the policy reasons underpinning the rule might not pertain in the factual setting before it. However, in the instant case, we do not believe we are departing from settled law. The subrogor in this case is not the client, but the defendant attorney held liable to the client for negligence at least partially attributable to the associated attorney. We do not believe the rule against assignment and subrogation was intended to operate in such circumstances.
The Fireman's Fund court also rejected the contention that the rule against subrogation of a nonassignable claim should not apply to claims for indemnity or contribution against the attorney liable to the insured client. (Id. at pp. 1385-1386, 36 Cal.Rptr.2d 424.) According to the court: "[R]egardless whether styled as a claim for subrogation, indemnity or contribution, the gravamen of Insurers' claim was legal malpractice as Insureds' actionable injury was allegedly the result of Law Firm's professional negligence. [Citations.] Accordingly, Insurer's cause of action was barred by the rule against assignment of legal malpractice claims. [Citations.]" *230 (Fireman's Fund, supra, 30 Cal.App.4th at pp. 1386, 1387, 36 Cal.Rptr.2d 424; see also, Baum v. Duckor, Spradling & Metzger (1999) 72 Cal.App.4th 54, 84 Cal. Rptr.2d 703.) However, in Fireman's Fund, the insured client's right of action against the former counsel was for legal malpractice.
Here, unlike the client in Fireman's Fund, Musser never had a malpractice cause of action against Provencher, for she was never his client. Thus, as she contends, she had no malpractice cause of action to assign, but only assigned to Home her indemnity action against Provenchera form of action between attorneys that has been recognized in Pollack v. Lytle, supra, 120 Cal.App.3d 931, 175 Cal. Rptr. 81 and that we recognize herein.
Consequently, not only is the subrogor in this case not the client, but the right of action which Musser seeks to transfer to Home is not truly one for malpractice. Although the root of the action is malpractice,[8] Home's is in truth subrogating to Musser's indemnity rights against Provencher.
In these unusual circumstances, we conclude the trial court erred in ruling that Home could not pursue a subrogation action against Provencher.

III.
Musser also contends the trial court erred in dismissing that portion of her damages action against Provencher in which she sought recovery of fees owed her by Scott, which fees she waived in her settlement with Scott. Provencher argues that Musser's settlement with Scott bars her cross-complaint for indemnity against him, because she has waived her claims for fees and because whether waived or not, the dismissal with prejudice of Musser's action (including her fee claim) against Scott constitutes a retraxit or voluntary relinquishment of the cause of action.[9]
The settlement with Scott contains a broad waiver and mutual release of claims, including releases of "all other persons, firms, ... of and from any and all claims, ... arising out of or in any way connected with (i) the dissolution, (ii) the litigation, or (iii) the fees." However, Musser argues that Provencher's challenge to her recovery of her costs and fees for the Scott dissolution was raised and abandoned as an affirmative defense in the summary adjudication proceedings upon the amendment of the settlement agreement between Musser and Scott to provide that, "SCOTT *231 and MUSSER hereby mutually release and forever discharge each other ... and all other persons [fn, Except that Musser is not waiving their indemnity and related claims against Mr. Provencher and his firm]." It would therefore appear that in settling with Scott, Musser did not expressly waive her right to pursue Provencher for damages she suffered in losing her fees and costs from Scott.
Provencher also argues the settlement with Scott constitutes a retraxit barring Musser from pursuing her claim for lost fees and costs against him. We disagree.
"A dismissal with prejudice is the modern name for a common law retraxit. [Citations.]" (Rice v. Crow (2000) 81 Cal.App.4th 725, 733, 97 Cal.Rptr.2d 110.) "`[A] dismissal with prejudice [is] a retraxit constituting a decision on the merits invoking the principles of res judicata.' (Torrey Pines Bank v. Superior Court (1989) 216 Cal.App.3d 813, 822 [265 Cal. Rptr. 217].)" (Id. at p. 734, 97 Cal.Rptr.2d 110.) Res Judicata is a doctrine precluding parties or their privies from relitigating a cause of action that has been finally determined by a court of competent jurisdiction. Moreover, any issue necessarily determined in such litigation is conclusively determined as to the parties or their privies where it is raised by one of the parties in a subsequent lawsuit on a different cause of action. (Id. at p. 734, 97 Cal.Rptr.2d 110; Vezina v. Continental Cas. Co. (1977) 66 Cal.App.3d 665, 669-679, 136 Cal.Rptr. 198.) This second aspect of res judicata is known as "collateral estoppel." (Vandenberg v. Superior Court (1999) 21 Cal.4th 815, 824, 828, 88 Cal. Rptr.2d 366, 982 P.2d 229; Rice v. Crow, supra, 81 Cal.App.4th at p. 734, 97 Cal. Rptr.2d 110.) The concept of collateral estoppel has been expanded to permit different parties, not a party to or in privity with a party to the prior action, to assert the doctrine defensively against one who was a party to the prior action to prevent relitigation of an issue which had already been actually litigated. (Bernhard v. Bank of America Nat. Trust & Savings Assn (1942) 19 Cal.2d 807, 811-812, 122 P.2d 892.)
"Res judicata is applicable only to the same causes of action between the same parties or their privies." (Rice v. Crow, supra, italics added.) "Since a retraxit linvok[es] the principles of res judicata,' it of course follows that a retraxit only bars claims dismissed with prejudice between the same parties or their privies. [Citations.]" (Id at p. 735, 97 Cal.Rptr.2d 110.) According to Justice Traynor in Bernhard v. Bank of America Nat. Trust & Savings Assn., supra, 19 Cal.2d 807, 122 P.2d 892: "A party in this connection is one who is `directly interested in the subject matter, and had a right to make defense, or to control the proceeding, and to appeal from the judgment.' [Citations.] A privy is one who, after rendition of the judgment, has acquired an interest in the subject matter affected by the judgment through or under one of the parties, as by inheritance, succession, or purchase. [Citations.]" (Id. at p. 811, 122 P.2d 892; accord Rice v. Crow, supra, at p. 735, 97 Cal.Rptr.2d 110.)
Provencher was a cross-defendant in the Musser action against Scott and therefore a party to the litigation. However, in granting Musser's motion for summary adjudication of Provencher's affirmative defenses, the court rejected Provencher's res judicata and collateral estoppel defense. The court found that the causes of action were not the same. Musser sought her unpaid fees from Scott and sought indemnity from Provencher for damages allegedly caused by his conduct. The fees and costs were part of the damages she sought *232 from Provencher, but were not a separate cause of action.
Nor was Musser collaterally estopped from pursuing these damages from Provencher. Although it is true a nonparty may assert the concept of collateral estoppel defensively as a "shield" to an action by a party to a prior action where the issue previously litigated was actually litigated and necessarily decided in the first action, that does not help Provencher here. The issues in the Scott versus Musser action were not actually litigated. "A settlement which avoids trial generally does not constitute actually litigating any issues and thus prevents application of collateral estoppel. (Rest.2d Judgments, § 27, com. e, p. 257 [`In the case of a judgment entered by confession, consent, or default, none of the issues is actually litigated']; see also, Landeros v. Pankey (1995) 39 Cal.App.4th 1167, 1171-1173, [46 Cal.Rptr.2d 165]....)" (Rice v. Crow, supra, 81 Cal.App.4th at p. 736, 97 Cal.Rptr.2d 110.) As the Musser cross-complaint against Scott for costs and fees in the dissolution action was settled and not tried, collateral estoppel does not bar Musser from litigating her entitlement to fees or costs as part of the damages she alleges she suffered as a result of Provencher's conduct.
Therefore, we conclude that in settling with Scott, Musser did not waive her rights to pursue a claim against Provencher, nor does the doctrine of retraxit bar her right to pursue him for damages she allegedly suffered which were attributable to him.

IV.
Finally, Musser contends the court erred in granting a judgment of nonsuit on her claim for damages based upon the $10,000 deductible she paid Scott. Provencher urges that Musser is precluded from pursuing this portion of her alleged damages under the doctrine of "invited error" occurring during the hearing on Musser's motion in limine concerning the $10,000 deductible as damages.
At the point of the motion in limine, the court had already ruled that Home could not be subrogated to Musser's cause of action for indemnity so that the bulk of the damages could not be recovered. As for Musser's fees and costs, the court held they could not be recovered because they were waived by Musser and there was a dismissal with prejudice. The court had not yet ruled on the viability of the action for the $10,000 deductible. On the morning of trial, Provencher's attorney Chris Miller, was unable to appear in court. Judge Smith indicated that he would nevertheless begin trial that day. Musser's attorney, Berline, could have pressed forward on the issue of the last remaining damages, the $10,000 deductible, and taken a default against Provencher. Inevitably, this would have required Provencher to seek relief from default under Code of Civil Procedure section 473, which undoubtedly would have been granted. Out of professional courtesy, and with a mind toward not wasting the resources of the court, Berline advised the court that he had communicated with Miller, who was unable to appear and that "for purposes of motions in limine I can appear for him." Berline indicated he was unsure on what ground he could proceed with the jury trial, given the court's prior rulings.[10] *233 The court asked Berline how he would proceed if the court were to rule consistent with its prior ruling. Berline replied that procedurally, it was a case "where all the damages will be stricken. I think it's probably then proper for the Court to simply enter a directed verdict in favor of defendant, because there is an element in my claim that I cannot prove that is damages." The court observed: "if I were to grant the in limine motion, then you will probably have to stipulate that you would have made an opening statement in which you cannot prove any damages. And if that were the stipulation, then I would grant any motion that seemed appropriate." Berline agreed and advised the court that he had authority to enter into such stipulation for purposes of opening statement. The court then ruled "consistent with my prior ruling that this ... essentially is a legal malpractice case and again would then strike the request for remaining damages that you have on file. [11] That would mean there are no damages that you could request. And your opening statement then would be consistent with that, not being able to allege any damages in your opening statement...." Berline acknowledged that was correct and stipulated that "this would be motion for non-suit by the other side." The court then granted the nonsuit.
Proving that "no good deed goes unpunished," Provencher cites Berline's statements above and argues that Berline "invited" any error. Clearly, Berline did not invite error, but acknowledged that if the court were to rule consistently with its prior rulings in the case as to the $10,000 deductible, it would be impossible for Musser to prove her damages. We conclude that by acknowledging the current state of the case and stipulating that Miller would make the argument that the court must grant the nonsuit based on the court's own past rulings, Berline did not "invite" any error.
The court erred in granting the nonsuit as to the deductible actually paid by Musser and not subrogated or assigned to Home.

CONCLUSION
The judgment is reversed and the matter remanded for further proceedings in accordance with the views set forth herein.
Each party shall bear its own costs on this appeal.
LAMBDEN and RUVOLO, J., concur.
NOTES
[1] "In reviewing a judgment of nonsuit, we accept plaintiffs version of the facts, giving [plaintiff] the benefit of all legitimate inferences and disregarding conflicting evidence." (Lupash v. City of Seal Beach (1999) 75 Cal. App.4th 1428, 1433, 89 Cal.Rptr.2d 920.)
[2] Although the record is unclear, the parties agree, and we shall assume, that Home is a party to this action and on appeal.
[3] In her briefs, and in various motions before the court, counsel referred to $30,000 as the amount of fees and costs expended in the Scott dissolution.
[4] San Diego Federal Credit Union v. Cumis Ins. Society, Inc. (1984) 162 Cal.App.3d 358, 208 Cal.Rptr. 494.
[5] We question the assumption that Pollack and Saunders are irreconcilable and disagree with the broad language of cases such as American Equity Insurance Company v. Beck (2001) 90 Cal.App.4th 162, 108 Cal.Rptr.2d 728, which rely upon the abstract proposition that there is necessarily no fiduciary duty among cocounsel.
[6] During the deposition of Provencher, someone (not identified in the record before us, but presumably Musser's attorney Alexander Berline) stated: "... issue of Pam's attorneyclient privilege that she had directly with you. [1] And as part of a good faith meet and confer, we have now obtained and provided you an executed partial waiver of that stipulation. [H] And just so we get it clear at the outset, the parameters of that waiver are essentially that Pam has waived the attorney-client and work product privileges and doctrines solely as to your initial retention and your work done on getting relief from the stay and the later motion for relief nunc pro tunc, and the following motion for reconsideration. But that your work on her bankruptcy estate, which is not germane to this action, that the privilege still is in effect. [H] And if I inadvertently go into those areas today, I assume you or Counsel will make me aware of that.

"A. Okay.
"MR. BERLINE: Is this a general recitation of how we're going to be operating today, Counsel?
"MR. CAVELLINI: Yeah. That's correct."
[7] Because we conclude that the claim being asserted by Musser is not one for legal malpractice, we have no occasion to determine whether Goodley's holding generally barring the assignment of legal malpractice claims is still sustainable. (But see, New Hampshire Ins. Co., Inc. v. McCann (1999) 429 Mass. 202, 707 N.E.2d 332, 335, 336, Hedlund Mfg. Co., Inc. v. Weiser, Stapler & Spivak (1988) 517 Pa. 522, 539 A.2d 357; Thurston v. Continental Cos. Co. (Me. 1989) 567 A.2d 922.)

Yet there is a legitimate question whether that opinion's view of the legal profession comports with the evolved attorney client relationship of today. The explanation that allowing the assignment of claims would unduly "debase" and "commercialize" the profession may very well have reflected the popular view in 1976. However, the fears which motivated Goodley's defense of an idealized attorney-client relationship are open to some doubt 25 years later. Legal actions against attorneys are now common, and the risk that assignments of claims will generate unfounded litigation unfairly burdening judicial dockets may be too speculative to justify continuing the prohibition. Moreover, Goodley's concerns are hardly consonant with a profession where attorneys can now secure their prospective fees by taking equitable positions in their corporate clients (ABA Model Code Prof. Responsibility, rule 1.5, com. 2; Vapnek et al., Cal. Practice Guide: Professional Responsibility (The Rutter Group 2000) § 5:898), clients can hypothocate potential non-personal injury judgments (Vapnek, supra, § 5:331 et seq.), the right to receive attorney fees and costs can be assigned to counsel if conflicts of interest rules are followed (Vapnek, supra, § 5:342 et seq.), and relaxed advertising rules have led to the almost unfettered, nonfraudulent marketing of legal services. (Cal. Rules Prof. Conduct, rule 1-400.)
While we have noted Court of Appeal decisions following Goodley, our Supreme Court has cited it only once (Smiley v. Citibank (1995) 11 Cal.4th 138, 145-146, 44 Cal. Rptr.2d 441, 900 P.2d 690), and then only as to an unrelated procedural principle of law. Thus, the continued viability of this rule created by intermediate appellate courts, has not yet been tested by the scrutiny of our high court.
[8] The cross-complaint for indemnity filed by Musser alleges with respect to its cause of action for implied contractual indemnity that Provencher's conduct in representing Scott "fell below the standard of care." All the items listed as to how Provencher's conduct did not meet the standard of conduct were legal services. Moreover, Musser's cross-cross-complaint also alleges that in Pam Scott's malpractice action against Musser, Scott had alleged that Provencher's failures were legally attributable to Musser. These allegations are incorporated into Musser's other causes of action. In the second cause of action for equitable indemnity, Musser alleges that her liability to Scott could only be derivative from or concurrent with Provencher's liability.
[9] Musser also contends that the trial court exceeded its jurisdiction in reconsidering the retraxit claim as a previous judge had granted her summary adjudication on this affirmative defense raised by Provencher. Our resolution of this issue on its merits makes it unnecessary to address this claim. However, we note that Judge Smith did not expressly reconsider this affirmative defense. He never referred to retraxit in granting the nonsuit as to the damages claim for fees and costs, but observed that Musser had waived her fee claim and therefore could not recover fees and costs from Provencher after the dismissal with prejudice. The order granting the nonsuit simply stated that Musser could not introduce evidence of fees and costs she had waived.
[10] Berline stated: "Therefore, it would appear to me that on the remaining claims that I have, Ms. Musser's $10,000 dollar deductible, that I will be presenting a legal malpractice case to the jury. Since the Court has ruled and it's well settled law, a legal malpractice case cannot be assigned, I don't see how under California law I can proceed with the remainder of my case.